# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHAGHTICOKE TRIBAL NATION, | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Case No: 3:06cv81 (PCD) |
| | : | |
| GALE NORTON, SECRETARY, | : | |
| DEPARTMENT OF THE INTERIOR, | : | |
| et al., | : | |
| Respondents, | : | |
| | : | |
| STATE OF CONNECTICUT, KENT | : | |
| SCHOOL CORPORATION, THE | : | |
| CONNECTICUT LIGHT & POWER | : | |
| COMPANY, and TOWN OF KENT, | : | |
| Intervenors-Respondents. | : | |

## RULING ON PETITIONER'S MOTION FOR ADDITIONAL LIMITED DISCOVERY AND ON PETITIONER'S MOTION FOR LEAVE TO AMEND COMPLAINT

This action involves a petition for review brought by Petitioner, Schaghticoke Tribal Nation ("STN"), under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"). Currently pending are STN's Motion for Additional Limited Discovery and Motion for Leave to Amend Complaint. For the reasons stated herein, STN's Motion for Additional Limited Discovery [Doc. No. 102] is **granted in part** and **denied in part** and STN's Motion for Leave to Amend Complaint [Doc. No. 103] is **granted**.

## I.    BACKGROUND

The facts relevant to this action were discussed at length in this Court's November 3, 2006 Ruling on, *inter alia*, STN's Motion for Leave to Take Discovery. See Schaghticoke Tribal Nation v. Norton, No. 3:06cv81 (PCD), 2006 U.S. Dist. LEXIS 81387, at *2-8 (D. Conn. Nov. 3, 2006). Familiarity with the facts and history of this case is assumed and accordingly, only those

facts relevant to this motion will be discussed here.

###### A.    Procedural History

On December 7, 1994, STN submitted its petition for federal recognition to the Bureau of Indian

Affairs ("BIA").[1]  On December 5, 2002, after a number of proceedings in this Court and before

the federal agencies and following review of the STN petition, the Office of Federal

Acknowledgment ("OFA") issued a Proposed Finding against tribal acknowledgment, finding

that STN had failed to satisfy the two key criteria set forth in 25 C.F.R. §§ 83.7(b)[2] and (c).[3]

STN and all interested parties then participated in the comment process, as provided for in 25

C.F.R. § 83.10(i).  On January 29, 2004, the Principal Deputy Assistant Secretary of Indian

Affairs, Aurene Michele Martin, notified STN and all interested parties of the Final

Determination, acknowledging the existence of STN as a tribe.  See 69 Fed. Reg. 5570 (Feb. 5,

2004).  On May 3, 2004, the State of Connecticut, together with the Kent School Corporation,

Connecticut Light & Power Company, the Town of Kent and other interested parties, filed

Requests for Reconsideration of the Final Determination with the Interior Board of Indian

Appeals ("IBIA"), pursuant to 25 C.F.R. § 83.11.  On November 29, 2004, STN submitted its

response to the IBIA opposing the Requests for Reconsideration.  Just three days later, on

December 2, 2004, the OFA filed a "Supplemental Transmittal" memorandum with the IBIA

---

[1]    The BIA and the Office of Federal Acknowledgment ("OFA") are charged with guiding Indian
tribes through the recognition process.  Pursuant to 25 C.F.R. §§ 83.10(b), (c)(1) and (j)(1), Indian
tribes may seek technical assistance from the BIA and the OFA at various points during the
recognition process.

[2]    25 C.F.R. § 83.7(b) requires that "[a] predominant portion of the petitioning group comprises a
distinct community and has existed as a community from historical times until the present."

[3]    25 C.F.R. § 83.7(c) requires that the tribe have "maintained political influence or authority over its
members as an autonomous entity from historical times until the present."

calling into question its own Final Determination. On May 12, 2005, the IBIA issued its decision to vacate and remand the Final Determination.

On October 12, 2005, the OFA announced its Reconsidered Final Determination ("RFD") denying STN's petition. The decision was published in the <u>Federal Register</u> on October 14, 2005. <u>See</u> 70 Fed. Reg. 60,101 (Oct. 14, 2005).[4] STN filed a Petition for Review of the RFD on January 12, 2006, and it is now before this Court on that administrative appeal. In their Petition for Review, STN argues that the actions leading up to the RFD "violate the APA because they are arbitrary and capricious, constitute an abuse of discretion, are contrary to the laws and regulations governing the Department of the Interior and the OFA with respect to the federal acknowledgment process, violated STN's rights to procedural due process, breached the United States' federal trust obligation to STN as an Indian tribe, and are the produce of unlawful political influence and congressional interference." (Pet. Rev. 25-26.)

**B.      Statement of Facts**

The instant Petition for Review was filed on January 12, 2006, however, the parties still have not filed their briefs on appeal. On August 9, 2006, STN filed a Motion for Leave to Take Discovery, seeking "limited discovery" on the question of whether improper political pressure influenced the Federal Respondents' decision to deny STN's petition for federal acknowledgment. The Federal Respondents argued that they had already produced all relevant documents and opposed any further discovery. STN alleged that there were certain contacts between the Connecticut congressional delegation and Connecticut state officials with persons in

---

[4]      In the RFD, the OFA found that STN failed to meet: (1) the "community" requirement set forth in 25 C.F.R. § 83.7(b) and (2) the political authority or influence criterion set forth in § 83.7(c).

the Department of the Interior ("DOI"), BIA, IBIA and OFA, and this Court found that although these contacts are not necessarily impermissible ones and do not necessarily prove that impermissible factors were taken into consideration in the acknowledgment process, they do raise some questions. Accordingly, STN was permitted to depose (1) Gale Norton, Former Secretary of the Interior, with regard to communications she received from members of the Connecticut congressional delegation, Connecticut state officials or any person or entity representing the State of Connecticut, and the role, if any, these communications played—through former Secretary Norton—in the Reconsidered Final Determination on STN's petition for federal recognition, and (2) James E. Cason, Associate Deputy Secretary of the Interior, with regard to any communication he received, directly or indirectly, from members of the Connecticut congressional delegation, Connecticut state officials or any person or entity representing the State of Connecticut, which pertained to the STN petition for federal recognition and what, if any, role such communications played in the Reconsidered Final Determination on the STN petition. No other discovery was permitted. STN now moves for additional limited discovery.

## II.     MOTION FOR ADDITIONAL LIMITED DISCOVERY

### A.     Standard of Review

As set forth in this Court's November 3, 2006 Ruling on, *inter alia*, STN's Motion for Leave to Take Discovery, the general rule on a petition for review is that courts confine their review of an administrative agency's decision to the administrative record. Citizens to Preserve Overton Park, 401 U.S. at 419-20 (1971). There is, however, a limited exception to this general rule where "there has been a strong showing in support of a claim of bad faith or improper

behavior on the part of agency decision makers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice." National Audubon Soc'y, 132 F.3d at 14 (citing Citizens to Preserve Overton Park, 401 U.S. at 420).

The requisite "strong showing" imposes a significant burden on the party moving for discovery, and as such, "[b]ald assertions of bad faith are insufficient to require agency officials to submit to depositions." Friends of the Shawangunks, Inc. v. Watt, 97 F.R.D. 663, 667 (N.D.N.Y. 1983). There is a presumption of validity in administrative action, Udall v. Washington, Virginia and Maryland Coach Co., 398 F.2d 765, 130 U.S. App. D.C. 171 (D.C. Cir. 1968), and thus, "a party seeking to depose an administrative official must show *specific facts* to indicate that the challenged action was reached because of improper motives." Watt, 97 F.R.D. at 668 (emphasis added); see also Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir. 1991) (finding that extra-record discovery was not appropriate based only on the petitioner's "speculative" claim, lacking any supporting evidence, that the agency wrongfully considered documents outside of the record in reaching its decision); City of Mt. Clemens v. EPA, 917 F.2d 908, 918 (6th Cir. 1990) (holding that the petitioner's "unsubstantiated allegation" that the agency acted in bad faith, when viewed in light of the detailed reasoning and careful procedures set forth in the record, was insufficient to warrant an exception to the general record rule); China Trade Center, L.L.C. v. Washington Metro. Area Transit Auth., 34 F. Supp. 2d 67, 70-71 (D.D.C. 1999) ("government officials are presumed to act in good faith . . . . Plaintiff must present 'well-nigh irrefragable proof' of bad faith or bias on the part of government officials in order to overcome this presumption") (internal citations omitted).

Although the party moving for extra-record discovery must come forward with significant evidence of wrongdoing, it is improper to "require [the moving party] to come forward with conclusive evidence of political improprieties at a point when they are seeking to discover the extent of those improprieties." Sokaogon Chippewa Cmty. v. Babbitt, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997) (noting that "agency officials are not likely to keep a written record of improper political contacts; the only way to uncover such contacts is by examining relevant phone records and by asking these officials about their discussions with congressional or presidential officials"). The Sokaogon Chippewa Community Court recognized the "important gatekeeping function" served by district courts in cases involving accusations of improper political influence, noting that "[i]f courts are too lenient, agency officials might spend much of their time defending themselves in court against allegations brought by parties disappointed with an agency's decision. However, if a court is never willing to scrutinize agency action, the gates become a cement wall, impervious even to legitimate claims of improper influence." Id. at 1280. This Court, like the Sokaogon Chippewa Community Court, recognizes the difficulty the moving party will have in producing evidence of wrongdoing before they have had an opportunity to conduct discovery, therefore, to obtain some limited discovery, a petitioner need only "supply sufficient evidence of improper political influence on agency decisionmaking as to raise suspicions that defy easy explanations." Id. at 1281. In this case, however, STN has already had the opportunity to conduct some limited discovery, both in the land claim actions and in the instant action. Accordingly, STN will be held to a higher standard than that set forth in Sokaogon Chippewa Community, although it still will not be required to produce "conclusive evidence of political improprieties."

## B.    Discussion

As an initial matter, the Court notes that a great deal of discovery has already taken place. After an August 11, 2006 conference with a PJO, the Federal Respondents conducted an additional search for documents and provided a Declaration of the decision-maker, James Cason. The search conducted by the Federal Respondents covered former Secretary Gale Norton's files, James Cason's email, electronic calendar and files, former Deputy Secretary J. Steven Griles' files and former Deputy Chief of Staff and Counselor to the Secretary David Bernhardt's files. The Federal Respondents also produced numerous documents as part of the FAIR database and in response to Freedom of Information Act ("FOIA") requests.  Moreover, as noted above, the November 3, 2006 Ruling permitted STN to take depositions of Gale Norton and James Cason. STN now seeks additional discovery.

### 1.    Documents & Deposition Regarding BGR's Actions on Behalf of TASK

Notwithstanding the fact that both former Secretary Norton and Associate Deputy Secretary Cason denied any contact with anyone affiliated with either Barbour Griffith and Rogers, LLC ("BGR")[5] or Town Action to Save Kent ("TASK")[6] concerning the Schaghticoke petition, and denied that they were aware of any BGR contacts with anyone else at the DOI, STN seeks further discovery of BGR.

In support of its motion, STN cites information received through FOIA demands. Specifically, emails between BGR and TASK detail BGR's "strategy of surrounding the

---

[5]    According to STN, BGR is a "high-powered, DC-based lobbying firm." (STN Mot. Add'l Ltd. Disc. 3.)

[6]    According to STN, TASK was formed by a group of Kent-based citizens in order to lobby Federal and State officials to reverse the original Positive Final Determination in favor of STN's recognition as an Indian tribe. (STN Mot. Add'l Ltd. Disc. 3.)

Department of the Interior with regards to the BIA," TASK represented in a January 7, 2005 email to local officials that BGR had "worked the offices of our Congressional delegates, met with key Committee chairs in both the House and the Senate, and [] had discussions with the Department of the Interior as well," and BGR stated in a January 13, 2005 email to TASK that "Gale Norton will be at an event tomorrow we are hosting. I will see what I can find out." (See STN Mot. Add'l Ltd. Disc. 4 (citing Exs. 4, 6, 7 to STN Mot. Add'l Ltd. Disc.).) Furthermore, BGR's Lobbying Report, filed in 2004, reflects that the "Department of the Interior" was among the "House(s) of Congress and Federal agencies contacted" by BGR as part of its lobbying effort on behalf of TASK. (Lobbying Report, Ex. 8 to STN Mot. Add's Ltd. Disc.)

As a result of this evidence, STN claims that "further inquiry is needed to determine the scope of BGR's actual contacts with Interior officials." (STN Mot. Add'l Ltd. Disc. 5.) Specifically, STN asks this Court to order BGR to produce:

> All documents, including all electronic messages in any form, dated at any time from January 1, 2004 through and including December 31, 2005, relating in any way to BGR's engagement by, representation of, and work for TASK.

(Id.) Further, STN asks that after these documents are produced, STN should be permitted to take the deposition of the BGR representative who, based on the documents, was most clearly aware of the actions taken by BGR on behalf of TASK.

Cason testified, however, that any interest of BGR "was not germane to me or the decision making as far as I was concerned." (Cason Dep. at 104, Ex. 8 to Fed. Resp. Mem. Opp.) Moreover, in an affidavit submitted by Kenneth Cooper, President of TASK, he indicated that, to the best of his knowledge and belief, "TASK, its officers, directors, and members and any lobbyists hired by TASK had not met with, nor communicated with, any officials in the

immediate offices of the Secretary of the Interior, the Assistant Secretary of the Interior or the Deputy Commissioner of Indian Affairs with respect to the Schaghticoke Tribal Nation Petition for Federal Recognition." (Cooper Aff. ¶ 3, Mar. 8, 2005, Ex. 1 to Fed. Resp. Mem. Opp.)  In addition, an affidavit submitted by Bradley A. Blakeman, Vice President of BGR, provides that apart from one attempted contact on May 12, 2005 (a phone call which was never returned) concerning procedures on remand, to the best of his knowledge and belief, neither he nor anyone else at BGR or any organization subcontracted to perform services for BGR met with, nor communicated with, any officials in the immediate offices of the Secretary of the Interior, the Assistant Secretary of the Interior, or the Deputy Commissioner of Indian Affairs with respect to the Schaghticoke Tribal Nation Petition for Tribal Recognition. (Blakeman Aff. ¶¶ 5-7, July 22, 2005, Ex. 2 to Fed. Resp. Mem. Opp.)

STN responds to these affidavits by noting that neither of them come from BGR's Loren Monroe, the person who sent the known email exchanges with State of Connecticut officials and others in which he discussed BGR's actions to contact the DOI.  (See Exs. 4, 7 to STN's Mot. Add'l Ltd. Disc.)  STN also argues that the Cooper and Blakeman affidavits are "largely meaningless," asserted that they address only known contacts with "officials in the *immediate* offices of the Secretary of the Interior, the Assistant Secretary of the Interior [a job that does not even exist], or the Deputy Commissioner of Indian Affairs [another position that does not exist]." (STN Mot. Add'l Ltd. Disc. 4-5 (emphasis and alterations in original).)

The evidence produced by STN raises some questions about whether there was improper political influence during the federal acknowledgment process at issue here.  TASK's email, representing that BGR had "worked the offices of our Congressional delegates, met with key

Committee chairs in both the House and the Senate, and [] had discussions with the Department of the Interior as well," BGR's statement in an email to TASK that "Gale Norton will be at an event tomorrow we are hosting. I will see what I can find out," and BGR's Lobbying Report, indicating that the "Department of the Interior" was among the Houses of Congress and Federal agencies contacted by BGR as part of its lobbying effort on behalf of TASK, when considered together, raise questions about the amount of political influence at the agency level. Cason's testimony that BGR's interests did not affect the decisionmaking process weighs against further discovery, however, "[a]gency officials should not be able to overcome a party's showing of political impropriety by simply denying all allegations of wrongdoing." Sokaogon Chippewa Cmty., 961 F. Supp. at 1281 (citing Latecoere Int'l v. United States Dep't of the Navy, 19 F.3d 1342, 1365 (11th Cir. 1994)). Moreover, Cason has also testified that other officials were involved in the decisionmaking process, and therefore, any influence on those officials is relevant to the determination. Accordingly, BGR is ordered to produce, on or before April 2, 2007:

> All documents, including all electronic messages in any form, dated at any time from January 1, 2004 through and including December 31, 2005, relating in any way to BGR's contacts, on behalf of TASK, with members of Congress and/or officials at the Department of the Interior.

Further, STN asks that after these documents are produced, STN will be permitted to take the deposition of the BGR representative who, based on the documents, was most clearly aware of the actions taken by BGR on behalf of TASK. STN shall notify Respondents and BGR as to the official to be deposed on or before April 9, 2007, and shall complete the deposition on or before April 23, 2007. The deposition shall be limited to any communications BGR had, on behalf of TASK, with officials at the Department of the Interior.

## 2.  Depositions of Interior Employees

James Cason, as Associate Deputy Secretary of the Interior, was the official charged with issuing the RFD, i.e., the decision that reversed STN's federal recognition.  In his deposition, Cason testified that he based that determination on the recommendation and advice of Lee Fleming and his OFA professional staff in a meeting held on October 5, 2005.  Among those present at the meeting were Lee Fleming, Director of the OFA, David Bernhardt, then the Deputy Chief of Staff to the Secretary, and Barbara Coen, an attorney in the Interior's Solicitor's Office. STN argues that because Cason denied any direct outside influence, it is critical to understand any outside influences that may have affected those individuals upon whose advice he relied. (STN Mot. Add'l Ltd. Disc. 6.)

Some political influence on the administrative process is "legitimate and positive," however, there are limits as to what is acceptable. CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE, 2 Admin. L. & Prac. § 6.13 (2d ed. 2006).  For example, "open communication" from political officials is not improper unless "the communication posed a serious likelihood of affecting the agency's ability to act fairly and impartially in the matter before it." Id. (quoting Power Authority of State of New York v. FERC, 743 F.2d 93, 110 (2d Cir.1984)).  The standard for determining whether communications are permissible is whether there was "actual bias," i.e., "whether extraneous factors intruded into an adjudication of an individual case." Id. (citing DCP Farms v. Yeutter, 957 F.2d 1183, 1188 (5th Cir.1992) (recognizing  that "an agency's patient audience to a member of Congress" does not mean that extraneous factors were considered)). "To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to and did cause the agency's

action to be influenced by factors not relevant under the controlling statute." Id. (quoting Town of Orangetown v. Ruckelshaus, 740 F.2d 185, 188 (2d Cir.1984)).

The Ninth Circuit has held that where there are multiple persons participating in the decision making process, the participation of one member who is "actually biased," or "where circumstances create the appearance that one member is biased, the proceedings violate due process," even in the absence of evidence that "the biased member's vote was decisive or that his views influenced those of other members." Stivers v. Pierce, 71 F.3d 732, 748 (9th Cir. 1995). Similarly, in Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986), Justice Brennan set forth his observations about the collective process of deliberation:

> while the influence of any single participant in this process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition. The participation of a judge who has a substantial interest in the outcome of a case of which he knows at the time he participates necessarily imports a bias into the deliberative process. This deprives litigants of the assurance of impartiality that is the fundamental requirement of due process.

Id. at 831.

STN argues, based on these authorities, that it should be permitted to depose Fleming, Bernhardt and Coen based on their participation in the decision-making process. Before STN can obtain this discovery, however, they must produce "significant facts" giving rise to an inference of bias; "[b]ald assertions of bad faith are insufficient to require agency officials to submit to depositions." Watt, 97 F.R.D. at 667-68.

### a. Lee Fleming

In a Declaration submitted in connection with this action, Cason stated: "In addition to reviewing the recommended Reconsidered Final Determination, in making this decision I relied

upon an oral presentation by the Director of the OFA, R. Lee Fleming and by the experts at the OFA who evaluated the evidence submitted during the administrative process." (Cason Decl. ¶ 7, Ex. 9 to STN Mot. Add'l Ltd. Disc.)  Based on this statement STN asserts that Fleming was a "key participant" in the decision making process, and sets forth evidence that Fleming was subjected to improper influence.

Fleming attended a hearing on the recognition of Indian tribes before the House Government Reform Committee on May 5, 2004.  The purpose of this hearing, as stated by Chairman Tom Davis, was "to explore questions about the objectivity and transparency of the BIA recognition process in connection with the decisions to recognize the Historical Eastern Pequot and the Schaghticoke tribes." <u>Betting on Transparency: Toward Fairness and Integrity in the Interior Department's Tribal Recognition Process—Hearing Before the H. Comm. on Gov't Reform</u>, 108th Cong. 108-198 (2004).  Fleming also attended hearings held before Senator John McCain's Committee on Indian Affairs on May 11, 2005.  During that hearing, various Connecticut state and federal officials criticized the federal recognition process, citing the Schaghticoke Positive Final Determination as an example of the problems inherent in the current system.  Finally, in July 2004, then Congresswoman Nancy Johnson attempted, unsuccessfully, to meet with DOI officials "to present the results of a survey she ha[d] completed concerning Federal Recognition issues."  The survey, sent to Johnson's constituents on postcards, asked whether the person agreed or disagreed with Johnson's position "opposing a new casino in western Connecticut.  Fleming wrote in an email at that time that he "view[ed] this as pressure from an elected official," but went on to state that "[t]he Federal acknowledgment process is not a popularity contest or poll." (July 20, 2004 email, Ex. 10 to STN Mot. Add'l Ltd. Disc.)  He

noted that the survey was nothing more than a "PR ploy" and correctly recognized that there was "nothing in the survey that specifically referenced any group/tribe seeking Federal acknowledgment as an Indian tribe – only whether to support a new casino." (Id.)

Fleming's statement that he viewed Johnson's survey as "pressure from an elected official" and his attendance at meetings with members of Congress, combined with the central role he appears to have played in the RFD, taken together, warrant the taking of his deposition. The deposition will be limited to any communication Fleming received, directly or indirectly, from members of the Connecticut congressional delegation, Connecticut state officials or any person or entity representing the State of Connecticut, which pertained to the STN petition for federal recognition and what, if any, role such communications played in Fleming's presentation to Cason with regard to the RFD. STN shall complete this deposition on or before April 13, 2007.

### b. David Bernhardt

At all relevant times during the Federal acknowledgment process, David Bernhardt served as the Deputy Chief of Staff to Secretary Norton. Secretary Norton testified at her deposition that Bernhardt attended two meetings with the Connecticut Congressional delegation and herself in March of 2004. STN uses this testimony as a basis for requesting Bernhardt's deposition, however, Norton already testified about those meetings at her deposition. (See Norton Dep. at 100-05, 155-70, Jan. 4, 2007, Ex. 7 to Fed. Resp. Mem. Opp.)[7] STN cites Norton's testimony

---

[7] Norton testified that she and Bernhardt met with Representative Chris Shays on March 4, 2004. (Norton Dep. at 100-01.) The recognition process, including the Schaghticoke decision, was discussed, and Representative Shays "chastised" the DOI with respect to the Schaghticoke determination. (Id. at 103.) Norton did not remember specifics of their conversation, but remembered that Shays was "not happy" with the Schaghticoke recognition. (Id. at 104.) She testified that she did not recall Shays making any threats during the meeting. (Id. at 105.)

14

about a comment from Representative Frank Wolf of Virginia, a member of the House Appropriations Committee and an opponent of Indian gaming. According to Norton, the members of Congress "felt strongly" that she should stop letting new gaming take place and Representative Wolf stated that he thought the President should fire her. (Id. at 168.) Norton testified that Wolf was the only member of Congress who made any threat, and stated that she "did not lose any sleep over that threat." (Id. at 168-70.) STN argues that Bernhardt's participation in these meetings and his subsequent participation in the October 5, 2005 briefing of Cason warrant the taking of his deposition, as Bernhardt "was fully exposed to the wrath of Congressional leaders challenging the Department's actions in recognizing the Tribe" and therefore, it is necessary to ascertain "the extent to which his input to Mr. Cason was tainted by those experiences." (STN Mot. Add'l Ltd. Disc. 12.)

Bernhardt's participation in the meetings with Norton and the Connecticut Congressional Delegation and his subsequent participation in the briefing of Cason warrant the taking of his deposition, however, the deposition shall be limited to the communications Bernhardt had with Cason regarding STN's petition for federal acknowledgment. STN shall complete this deposition on or before April 13, 2007.

        *c.*     *Barbara Coen*

Barbara Coen is and was at all relevant times an attorney in the DOI's Solicitor's Office.

---

Norton also testified about a March 30, 2004 meeting in which she and Bernhardt met with Representative Shays, Representative Nancy Johnson, Representative Simmons, and Representative Frank Wolf from Virginia. In that meeting, the congressmen discussed the proliferation of casinos in Connecticut and suggested a moratoria both on tribal recognition and gaming approvals. (Id. at 162-64.) They mentioned that the Schaghticoke process "should be investigated in terms of outside influence," and Norton responded that "it had been a fair and reasonable process as far as [she] was able to determine." (Id. at 167.) The meeting was an "emotional" one, as there were strong feelings all around. (Id. at 168.)

According to STN, she attended the October 5, 2005 briefing and participated in the deliberative process. Moreover, she signed the December 2, 2004 "Supplemental Transmittal" submitted to the IBIA by the OFA, calling into question its own Final Determination.[8] In both his declaration and deposition testimony, Cason testified that "the attorneys" present at the October 5 briefing, when asked "what else do I need to know," advised him that STN would likely argue that the decision was the result of lobbying and gaming or anti-gaming interests.[9] STN argues that as an attorney involved in the deliberative process, Coen's influences must be explored in a brief deposition. STN has not produced any evidence, however, that Coen was subjected to improper influences, was biased in any way, or acted in bad faith. The fact that she participated in the deliberative process in not sufficient, without more, to justify the taking of her deposition.

In a "Supplemental Memorandum" filed on February 23, 2007, STN asserts that "new information just produced by the Federal Respondents emphasizes the central role played in the recognition process by Coen, revealing that the justification for her deposition is now even greater." (STN Suppl. Mem. 1.) STN attaches to its Supplemental Memorandum seven pages of notes taken by Rita Souther, a genealogist with the OFA who worked on STN's petition. Nothing in that document alters the Court's conclusion with regard to the taking of Coen's deposition.[10] STN has not set forth sufficient facts to justify taking Coen's deposition.

---

[8] The Supplemental Transmittal addressed the marriage-rate analysis employed in the Positive Final Determination. STN argues that the submission of the Supplemental Transmittal to the IBIA was "unprecedented," and was the first time the DOI altered its practices when a recognition decision was pending before the IBIA for review. (STN Reply 3.)

[9] During discovery in the related land-claim litigation, STN argued that BGR was lobbying in violation of the Court's Scheduling Order.

[10] STN's assertion that the notes reveal "a concern about 'ex parte contact'" is misleading. This note related to instructing the IBIA on how to use the FAIR database, not to any effort concerning the merits of the decision. If anything, this note weighs against further discovery, as it indicates that

3.      Search of James Cason's Email

STN asserts that the search initially conducted of Cason's email was inadequate and asks this Court to require the DOI to search the body and text of Cason's incoming and outgoing email messages during the relevant time period. (STN Mot. Add'l Ltd. Disc. 13.)  In their Opposition brief, the Federal Respondents assert that they have conducted a second search as requested.  According to the Federal Respondents, this second search did not result in any documents relating to the Schaghticoke petition or acknowledgment decisions or any response or reaction to them.  Because the requested search was already conducted, this issue is moot.

4.      Norton File

As part of the voluntary production of documents provided by the DOI, STN was provided with copies of Secretary Norton's daily calendars and other documents which had previously been the subject of a FOIA response.  In addition, Secretary Norton's file labeled "Schaghticoke Tribal Issues" was in the process of being scanned and reviewed, and any documents not in the administrative record were provided to STN and the Intervenor-Respondents by letter dated September 29, 2006.  On January 4, 2007, a Notice of Deposition along with a Production Request, substantially tracking the language in the Court's Ruling which limited the areas of inquiry for deposition, was served on Norton's counsel.  In response to the Production Request, Norton provided to her counsel a file folder with documents relating to matters of tribal recognition generally.  When asked about this folder of documents, Norton's counsel stated for the record that "[n]othing in the folder relates to the limited scope of this deposition or what was requested in the Notice of Deposition except for, perhaps, one document.

_____

the OFA was extremely cautious about any potential for improper ex parte contacts.

17

And that one document, as I look at it, is arguably not even covered by the Notice of Deposition. . . . I have to get further review of whether I can release it or not. . . . But every other document that Ms. Norton found that she had was not responsive to the request." (Norton Dep. at 15.) When asked to describe the materials in general, Norton testified that "it was regarding tribal recognition generally, and was largely background materials about the recognition process." (Id. at 16.) On January 12, 2007, counsel for Norton sent a letter to STN's counsel, advising that upon further review, it was determined that none of the documents in Norton's possession were responsive to STN's January 4, 2007 Production Request.

Petitioner now requests that the Court direct the Federal Respondents to produce that file for an *in camera* review, citing only the "significance of Norton's role in the process," and the fact that the documents were not included in the FAIR database. (STN Mot. Add'l Ltd. Disc. 14.) According to the Federal Respondents, the documents were not "a communication received by or from a member of the Connecticut Congressional delegation or a Connecticut state official, or someone acting on their behalf, or from [BGR] or TASK," and therefore, are not responsive to STN's Production Request. (Fed. Resp. Mem. Opp. 17.)

Although, based on the Federal Respondents' representations, the Court doubts the relevancy or responsive nature of the documents in the file, it will order the documents produced for *in camera* review. The Norton file discussed herein shall be produced to the Court for *in camera* review on or before April 2, 2007.

## III.    MOTION FOR LEAVE TO AMEND

### A.    Standard of Review

Leave to file an amended complaint "shall be freely given when justice so requires." Fed.

R. Civ. P. 15(a).  The district court has discretion as to whether leave to amend should be granted, Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962), however, "that discretion must be exercised in terms of a justifying reason or reasons consonant with the liberalizing spirit of the Federal Rules." United States v. Continental Illinois Nat'l Bank & Trust, 889 F.2d 1248, 1254 (2d Cir. 1989) (quoting Federal Rule of Civil Procedure 1, which states that the rules are to be construed "to secure the just, speedy, and inexpensive determination of every action.").

Leave should be "freely given" in the absence of a stated or apparent reason to the contrary, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  Foman, 371 U.S. at 182.  "The court plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990).  A court may find that undue prejudice exists "when extensive additional discovery would be required, when further proceedings would be delayed significantly, or where an imminent danger exists that the moving party seeks to force a favorable settlement by abusive use of the discovery process." Naglieri v. Bay, 977 F. Supp. 131, 136 (D. Conn. 1997).  In making this determination, the Second Circuit has noted that "the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of showing prejudice." Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993).

Finally, as stated above, "it is well established that leave to amend a complaint need not

be granted when amendment would be futile." <u>Ellis v. Chao</u>, 336 F.3d 114, 127 (2d Cir. 2003) (citing <u>Foman</u>, 371 U.S. at 182). A motion to amend is futile and may be denied on that basis "[w]here the amended portion of the complaint would fail to state a cause of action." <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 339 (2d Cir. 2000) (internal citation omitted); <u>see also Dougherty v. Town of North Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6).") (internal citation omitted). A party opposing a motion for leave to amend has the burden of proving that such amendment is futile, and "[i]n making this determination, the court should not consider the merits of a claim or defense on a motion to amend unless the amendment is 'clearly frivolous or legally insufficient on its face.'" <u>Sokolski v. Trans Union Corp.</u>, 178 F.R.D. 393, 396-397 (E.D.N.Y. 1998) (citations omitted).

### B.     Background

James Cason was appointed by Secretary Norton to be Associate Deputy Secretary of the DOI on August 9, 2001. The position of DOI Associate Deputy Secretary is classified as a Senior Executive Service (SES) "general" position, which may be filled through either a career or a non-career appointment. Comptroller General of the United States, Opinion B-290233, 2002 U.S. Comp. Gen. LEXIS 265, at *2 (Oct. 22, 2002). DOI non-career appointees, such as Cason, serve at the will of the Secretary. <u>Id</u>. at *2 & n.2.

On February 12, 2005, David Anderson resigned from his position as Assistant Secretary for Indian Affairs ("AS-IA"), which requires a Presidential appointment and Senate confirmation (hereinafter, a "PAS" appointment). Cason, without being appointed by the President or confirmed by the Senate, became Acting AS-IA the following day. Cason was assigned to act as

AS-AI by designation from Secretary Norton.

## C.    Discussion

STN seeks to amend its Petition for Review to add the following allegation as a

subparagraph of paragraph 78:

> (a) James Cason's actions with respect to the Reconsidered Final Determination are
> null and void because they constituted *ultra vires* actions of an unauthorized
> individual.   In October 2005, at the time Mr. Cason purported to decide the
> Reconsidered Final Determination denying STN federal recognition, Mr. Cason was
> (1) serving as "Associate Deputy Secretary" of the Department of the Interior in
> violation of the Appointments Clause of the Constitution, see U.S. Const. Art. II, sec.
> 2, and/or (2) was delegated responsibility to serve as the Acting Assistant Secretary
> for Indian Affairs in violation of the provisions of the Vacancies Reform Act, 5
> U.S.C. § 3345, et seq.

(STN Mot. Amend 6.)  Respondents' primary argument in opposition to STN's motion to amend

is that the proposed amendment would be futile.  Respondents also argue that STN's motion to

amend is not based on newly discovered information.[11]

The proposed amendment seeks to add two allegations to the Petition for Review.  First,

the amendment alleges that at the time of making the RFD in October 2005, James Cason was

serving as Associate Deputy Secretary of the DOI in violation of the Appointments Clause of the

United States Constitution.  Second, the amendment alleges that the responsibility to serve as the

Acting Assistant Secretary for Indian Affairs was delegated in violation of the provisions of the

Vacancies Reform Act, 5 U.S.C. § 3345, et seq.  STN contends that these allegations are "already

---

[11]       Respondents do not argue that STN's motion to amend is brought in bad faith or that they would
be prejudiced by the amendment.  The fact that the motion to amend may not be based on newly
discovered information does not, by itself, provide a basis for denying the motion. See State
Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delays, . . .
absent a showing of bad faith and undue prejudice, do not provide a basis for a district court to
deny the right to amend.").  Therefore, the Court will address only the question of whether the
proposed amendment would be futile.

subsumed within the general assertions of its Petition," but seeks leave to amend "in an abundance of caution." (STN Mot. Amend 2.)

### 1. Appointments Clause

STN argues that Cason, in his capacity as Associate Deputy Secretary, performed duties that rendered him a "principal officer" of the United States, and as such, he is required by the Appointments Clause of the Constitution to have been a PAS appointee. The issue here, therefore, is whether the duties performed by Cason in his capacity as Associate Deputy Secretary rendered him a "principal officer." Notwithstanding the Comptroller General's Opinion,[12] cited by the Federal Respondents, there is a question of fact whether Cason's duties as Associate Deputy Secretary rendered him a "principal officer" of the United States, requiring a PAS appointment. Accordingly, this proposed amendment is not futile and will be permitted.

### 2. Vacancies Reform Act

STN asserts that Cason issued the RFD in his capacity as Acting AS-IA. As such, STN contends that Cason's delegation to serve as AS-IA violated the Vacancies Reform Act. First, the Federal Respondents argue that Cason issued the RFD in his capacity as Associate Deputy Secretary of the DOI, pointing out that the Cason signed the RFD as the Associate Deputy Secretary of the DOI rather than as the Acting AS-IA. <u>See</u> Reconsidered Final Determination To

---

[12] In an opinion issued October 22, 2002, the Comptroller General, in response to a Senator's concern that the DOI Associate Deputy Secretary was exercising all of the authorities of the Secretary of the Interior without being nominated by the President and confirmed by the Senate, concluded that "the incumbent DOI Associate Deputy Secretary does not exercise 'significant authority' for purposes of the Appointments Clause and therefore is not an officer of the United States." Comptroller General of the United States, Opinion B-290233, 2002 U.S. Comp. Gen. LEXIS 265 (Oct. 22, 2002). Accordingly, the Comptroller General concluded that it was not necessary for the DOI Associate Deputy Secretary to be a PAS appointment. The Federal Respondents do not cite, however, any case law directly supporting their position. It appears that the question of whether the DOI Associate Deputy Secretary is a "principal officer" of the United States has not been definitively resolved by the courts.

Decline To Acknowledge the Schaghticoke Tribal Nation, 70 Fed. Reg. 60,101 (Oct. 14, 2005).[13]

Second, the Federal Respondents argue that Cason's authority to act was set forth in the RFD and the Federal Register Notice. The Federal Register Notice explicitly provides that it was "published in the exercise of authority delegated by the Secretary of the Interior to the Associate Deputy Secretary by Secretarial Order 3259, February 8, 2005, as amended on August 11, 2005." Id. Similarly, the RFD provides that: "By Secretarial Order 3259, dated February 8, 2005, as amended on August 11, 2005, the Secretary relegated the duties, functions, and responsibilities of the AS-IA to the Associate Deputy Secretary (ADS). Therefore, the ADS issues this Reconsidered Final Determination." (RFD at 1 n.1, Ex. 1 to Fed. Resp. Mem. Opp. Mot. Amend.)

The Vacancies Reform Act, 5 U.S.C. §§ 3345-3349d, (the "Act"), establishes several ways to fill a PAS vacancy on an "acting" basis. See 5 U.S.C. § 3345. The DOI, however, did not have anyone appropriated situated to assume "acting" AS-IA duties after David Anderson's departure. In the case of a PAS vacancy not filled with an "acting" official, the Act requires that the position remain vacant and that only the agency head may perform the "functions and duties" of the position. 5 U.S.C. § 3348(b). In an effort to ease the burdens on the agency head, however, Congress limited the "functions and duties" that must be performed by the agency head to those that are required by statute or regulation to be performed exclusively by the official occupying that position. 5 U.S.C. § 3348(a)(2). Accordingly, any functions or duties not required by statute or regulation to be performed by the official occupying that position may be reassigned to another official within the agency or department.

---

[13] The RFD was signed by "James E. Cason" as "Associate Deputy Secretary."

Secretary Norton issued Secretarial Order 3259, effective February 13, 2005, which delegated the authority delegated to the AS-IA to the Associate Deputy Secretary, "except for those functions or duties that are required by statute or regulation to be performed only by the [AS-IA]." (Secretarial Order 3259, Ex. 2 to Fed. Resp. Mem. Opp. Mot. Amend.)  The Order provided that the duties required by statute or regulation to be performed only by the AS-IA will be performed by the Secretary herself, in accordance with the Vacancies Reform Act. (Id.)[14] Cason, therefore, did not assume the position of Acting AS-IA, but only assumed the duties of the position not required by statute or regulation to be performed only by the AS-IA.

The question becomes, therefore, whether the authority to make tribal acknowledgment decisions is required by statute or regulation to be performed only or exclusively by the AS-IA. The Federal Respondents argue that it is not, asserting that because STN has not identified any such statute or regulation, the Associate Deputy Secretary had authority to issue the RFD under Order 3259.  STN, however, argues that the authority to make tribal acknowledgment decisions is required by the regulations to be performed exclusively by the AS-IA, citing 25 C.F.R. § 83.10, which provides, *inter alia*, that "the Assistant Secretary[15] *shall* cause a review [of applications for acknowledgment] to be conducted to determine whether the petitioner is entitled to be acknowledged as an Indian tribe," 25 C.F.R. § 83.10(a), "the Assistant Secretary *shall* conduct a preliminary review of the petition for purposes of technical assistance," id. § 83.10(b), "the Assistant Secretary *shall* make a final determination regarding the petitioner's status," id. §

---

14      The Order "will automatically expire either upon the confirmation of a new [AS-IA], or upon the delegation of an Acting [AS-IA] in accordance with the Vacancies Reform Act." (Id.)  According to the Federal Respondents, a new AS-IA has been nominated and is awaiting Senate confirmation.

15      The regulations define "Assistant Secretary" as "the Assistant Secretary -- Indian Affairs, or that officer's authorized representative." 25 C.F.R. § 83.1.

83.10(l)(2), and "[t]he Assistant Secretary *shall* acknowledge the existence of the petitioner as an Indian tribe when it is determined that the group satisfies all of the criteria in § 83.7," id. § 83.10(m). (emphasis added)  Congress' use of "shall" in connection with the performance of these duties is contrasted with its use of the permissive "may" in connection with other duties in this same section.  Neither party cites any case law addressing this issue.

The Court finds that further briefing and development of the record is necessary to answer question of whether the authority to make tribal acknowledgment decisions is required by statute or regulation to be performed only or exclusively by the AS-IA.  The proposed amendment is not futile; STN will be permitted to amend their Petition for Review as requested.

IV.    **CONCLUSION**

For the foregoing reasons and in accordance with the terms set forth herein, STN's Motion for Additional Limited Discovery [Doc. No. 102] is **granted in part** and **denied in part** and STN's Motion for Leave to Amend Complaint [Doc. No. 103] is **granted**.  STN shall file their First Amended Petition for Review on or before March 30, 2007.

SO ORDERED.

Dated at New Haven, Connecticut, March  19 , 2007.

_____
                              /s/
                Peter C. Dorsey, U.S. District Judge
                United States District Court

25