# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHAGHTICOKE TRIBAL NATION | : |
|       Petitioner, | : |
| v. | :   CASE NO. 3:06CV00081 (PCD) |
| DIRK KEMPTHORNE, SECRETARY, DEPARTMENT OF THE INTERIOR, ET AL., | : |
|       Respondents, | : |
| STATE OF CONNECTICUT, KENT SCHOOL CORPORATION, THE CONNECTICUT LIGHT AND POWER COMPANY, and TOWN OF KENT, | : |
|       Intervenors-Respondents. | :   March 30, 2007 |

## FIRST AMENDED PETITION FOR REVIEW

## INTRODUCTION

1.     This is a petition for review (hereinafter referred to as the "appeal") brought by

the Schaghticoke Tribal Nation ("STN") under the Administrative Procedure Act ("APA"), 5

U.S.C. § 551 et. seq. This appeal seeks review of the actions taken by the Department of the

Interior, Secretary Norton, Associate Deputy Secretary Cason, the Bureau of Indian Affairs

("BIA"), the Office of Federal Acknowledgment[1] ("OFA"), and the Interior Board of Indian

Appeals ("IBIA") in issuing the Reconsidered Final Determination Denying Federal

Acknowledgment of the Petitioner Schaghticoke Tribal Nation (the "Reconsidered Final

---

[1] In July of 2003, the BIA's Branch of Acknowledgment and Research ("BAR") was moved out of the BIA and into the Office of the Assistant Secretary-Indian Affairs and became the Office of Federal Acknowledgment ("OFA"). All references in this petition for review to OFA should be read to mean BAR when discussing activities prior to July 2003.

Determination") under the Federal Acknowledgment Regulations (the "Acknowledgment Regulations"), 25 C.F.R. Part 83, after previously issuing a positive Final Determination.  A copy of the Final Determination recognizing STN is attached as Exhibit A.

2.     The Reconsidered Final Determination was announced by OFA on October 12, 2005 and published in the Federal Register on October 14, 2005.  A copy of the Reconsidered Final Determination is attached as Exhibit B.

**VENUE AND JURISDICTION**

3.     This Court has subject matter jurisdiction over STN's appeal under the APA. 5 U.S.C. § 702.  This Court has personal jurisdiction over the parties and venue in this Court is appropriate pursuant to the May 8, 2001 Scheduling Order entered by the Court in the following consolidated cases:  United States of America v. 43.47 Acres of Land, More or Less Situated in the County of Litchfield, Town of Kent, et al., Civil Action No. H-85-1078 (PCD); Schaghticoke Tribal Nation v. Kent School Corporation, Inc., et al., Civil Action No. 3:98-cv1113 (PCD); and Schaghticoke Tribal Nation v. The United States of America and The Connecticut Light and Power Company, et al., Civil Action No. 3:00-cv-0820 (PCD) (the "consolidated cases").

4.     Specifically, this Court may consider STN's appeal under Paragraph (k) of the Scheduling Order.  Paragraph (k) originally provided that:

> (k)     Any petition for review of the final determination under the Administrative Procedure Act by any party to these cases shall be filed within 90 days of the date that notice of the final determination was served and shall be filed in this court as a case related to the above-captioned cases.

5.     The Court amended Paragraph (k) at the joint request of the parties and *amici* to the consolidated cases on February 27, 2004.  Paragraph (k) now provides that:

(k)     Any request for judicial review of the final decision under the [APA] by any party or *amici* to these cases shall be filed within 90 days of its effective date and shall be filed in this Court as a case related to the above-captioned case.

6.      This amended language clarified that any petition for APA review would be filed with this Court within 90 days after the date that the final decision was posted in the Federal Register as opposed to within 90 days of the date that notice of the decision was served.  This amended language precluded the possibility of an APA action before the administrative process was complete.

## THE PARTIES

7.      Petitioner Schaghticoke Tribal Nation is an Indian tribe which has resided in the State of Connecticut since time immemorial.

8.      Respondent Gale Norton is the Secretary of the United States Department of the Interior.

9.      Respondent James E. Cason is the Associate Deputy Secretary of the United States Department of the Interior.  By Secretarial Order 3259, dated February 8, 2005, as amended on August 11, 2005, Secretary Norton delegated the duties, functions, and responsibilities of Assistant Secretary – Indian Affairs ("AS-IA") to the Associate Deputy Secretary.  Pursuant to this Secretarial Order, Mr. Cason approved and signed the Revised Final Determination.

10.     Respondent United States Department of the Interior is the federal agency that is responsible for administering the Federal Acknowledgment regulations ("Procedures for Establishing that an Indian Group Exists as an Indian Tribe," 25 C.F.R. Part 83) and the federal acknowledgment process.

11.     Respondent Bureau of Indian Affairs is a part of the United States Department of the Interior.  The BIA bears primary responsibility for carrying out the federal trust obligation to Indian tribes and managing inter-governmental relationships with those tribes.

12.     Respondent Office of Federal Acknowledgment, formerly Branch of Acknowledgment and Research within the BIA, operates within the Office of the Assistant Secretary-Indian Affairs and is principally responsible for administering the Federal Acknowledgment regulations.

13.     Respondent Interior Board of Indian Appeals reviews requests for reconsideration of Final Determinations issued by the Assistant Secretary-Indian Affairs under the Federal Acknowledgment Regulations (25 C.F.R. § 83.11) and reviews all appeals from decisions made by officials of the BIA (25 C.F.R. § 2.3).

**PROCEDURAL HISTORY**

14.     STN formally began its quest for federal acknowledgment with the filing of its Notice of Intent, pursuant to 25 C.F.R. § 83.4, received on December 14, 1981.  That entry into the federal acknowledgment process, more than twenty years ago, began STN's efforts to meet the demanding (and changeable) standards applicable to establish tribal existence through the Department of the Interior's administrative process.

15.     STN has filed and been involved in Connecticut land claim cases for the past three decades.  On April 17, 1975, STN and tribal members Trudy Lamb, Kay Peck and Catherine Velky, on behalf of themselves and all others similarly situated, filed a Complaint[2] with this Court seeking to restore certain aboriginal and reservation lands located in the Town of

---

2     Civil Action No. H-75-125.

Kent, Connecticut, under the Nonintercourse Act, 25 U.S.C. § 177 (hereinafter referred to as the "1975 land claim action"). The named Defendants were Kent School Corporation, Inc., Preston Mountain Club, Connecticut Light and Power Co., M. Bruce Solomon, as conservator of the Estate of Florence E.M. Baker Bonos, Arjay Miller, Francis Miller, J. Porter Brinton, Jr., Raymond A. Cross, and the Town of Kent. On March 16, 1978, the court granted Defendants' request to bring in the State of Connecticut and the United States of America as third-party Defendants.

16.     The 1790 Nonintercourse Act created a special trust relationship between the United States government and Indian tribes with respect to the disposition of their lands in that the United States assumed responsibility to protect and guard Indian tribes against unfair or fraudulent treatment in land transactions with private individuals. See Seneca Nation of Indians v. U.S., 173 Ct. Cl. 917 (Ct. Cl. 1965); Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. 1975).

17.     On December 16, 1985, the United States National Parks Service, part of the Department of the Interior, filed a Complaint[3] seeking to take possession of approximately 43.47 acres of land located in the Town of Kent, Connecticut, in order to preserve or expand the Appalachian Trail. The United States named several Defendants who might have an interest in the property, including STN by virtue of its prior 1975 land claim action. In defending this action, it became necessary for STN to establish its existence as a tribe sufficient to invoke the protections of 25 U.S.C. § 177 - - prohibiting alienation of tribal land. This required STN to seek federal recognition from the BIA.

---

[3]     Civil Action No. H-85-1078 (PCD)

18.     In January 1989, the parties to the 1975 land claim action reported to the Court that a tentative settlement had been reached.  The agreement, however, required legislative and judicial cooperation.  The parties also noted that the land sought by the United States in the 1985 action was subject to STN's land claims.  In June 1993, the Court granted a stipulation of voluntary dismissal in the 1975 land claim action.

19.     On February 24, 1994, the Court granted the United States' Motion for Summary Judgment against STN in the 1985 action because of a lack of resources STN had not yet proved that it was a federally recognized tribe under the federal acknowledgment process.

20.     On December 7, 1994, pursuant to 25 C.F.R. § 83.10(a), STN submitted its petition for federal recognition to the BIA.  BIA and OFA, with their research expertise in the field, are charged, through their rules and procedures with guiding Indian tribes through the difficult recognition process.  Specifically, the Acknowledgment Regulations provide for Indian Tribes to seek technical assistance from the BIA and OFA at various points during the recognition process.  See e.g., 25 C.F.R. § 83.10(b), (c)(1) and (j)(1).

21.     On March 10, 1995, the Court granted STN's Motion to Reopen the 1985 case and temporarily stayed the action based on the Second Circuit's decision in Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51 (2d Cir. 1994).  That case held that land claim cases should be temporarily stayed pending determination by the BIA concerning federal recognition.

22.     On June 5, 1995, the BIA responded to STN's petition with an Obvious Deficiency letter, pursuant to 25 C.F.R. § 83.10(b)(2).  That letter noted areas where supplemental information was needed.  STN, by itself, and through a research team, then engaged in extensive research and analysis to answer BIA's criticisms of its petition.

23.     On February 27, 1997, the Court denied the United States' Motion for Reinstatement of Judgment in the 1985 action and, instead, extended the stay of the action. In so ruling, the Court noted that STN had demonstrated good cause to extend the stay. Specifically, STN did not have the financial resources to immediately respond to BIA's June 5, 1995 Obvious Deficiency letter.

24.     In June 1997, BIA put the STN petition on its "Ready, Waiting for Active Consideration" list, 25 C.F.R. § 83.10(d). STN's petition was 11th on that list, but also behind all of the other tribes on the "Active Consideration" list. At this time, STN's petition had been extensively supplemented, including separate narratives covering History, Anthropology and Genealogy as well as thousands of supporting documents.

25.     Given the exceptional circumstance whereby several lawsuits had been stayed pending the BIA's determination of STN's federal tribal status, on February 13, 1998, STN requested that the Assistant Secretary-Indian Affairs direct the BIA to grant immediate active consideration of the STN petition by moving it ahead of other petitions in the "Ready, Waiting for Active Consideration" list. This request was denied.

26.     While STN awaited substantive BIA action on its petition, on May 5, 1998, it filed a Motion for Separate Trial in the 1985 action to determine tribal status. This motion requested that the Court take over the federal recognition process because the BIA process had broken down to the extent it did not have the manpower or other resources to provide relief to STN or other petitioners. Specifically, the BIA had admitted that a significant backlog existed. It was clear it would be decades before the agency could consider and reach a decision concerning the merits of STN's application.

27.     On June 12, 1998, STN filed a Complaint[4] seeking to restore possession of certain aboriginal and reservation lands located in the Town of Kent, Connecticut, under the Nonintercourse Act, 25 U.S.C. § 177. In this action, STN was seeking to restore lands located mostly north and east of its present day State Reservation. These land claims are substantially similar to STN's 1975 land claims. The named Defendants are: Kent School Corporation, Inc.; Preston Mountain Club; Connecticut Light and Power Company; Town of Kent; Loretta E. Bonos, as Administratrix of the Estate of Florence E.M. Baker Bonos; Appalachian Trail Conference Inc.; Barbara G. Bush; estate of Eugene L. Phelps; and New Milford Savings Bank.

28.     On July 13, 1998, STN filed a Motion for Separate Trial in the 1998 action to determine tribal status. On March 31, 1999, the Court denied STN's Motion for Separate Trial to take over the recognition process. The Court also continued to stay both the 1985 and the 1998 actions.

29.     On February 11, 2000, the AS-IA issued a directive, 65 Fed. Reg. 7052 (Feb. 11, 2004), that significantly changed the acknowledgment process including greatly reducing OFA's research and involvement in the development of the tribal petitions. At this time, STN's petition was already submitted and awaiting consideration. Prior to this directive, in the consideration of other petitions, OFA staff made field visits, conducted interviews, and engaged in independent research to evaluate and provide technical assistance "to ensure that the petitioner presents the strongest case possible and is not turned down for technical reasons." BIA, Branch of Acknowledgment and Research, The Official Guidelines to the Federal Acknowledgment Regulations, 12-13 (1997). The staff used those visits to gain greater understanding of the petitioning community than might be readily available from the documents submitted.

---

4     Civil Action No. 3:98-CV-1113 (PCD)

30.     STN had every reason to believe that OFA would continue this practice and that OFA was interested in seeking all information relevant to the proper determination of tribal status. Instead, OFA was instructed to greatly reduce all such research. This drastic change in OFA practice was made without APA notice and comment and therefore violated the APA. This directive was ultimately revoked on March 31, 2005, 70 Fed. Reg. 16,513 (Mar. 31, 2005). However, by that time it was already too late to benefit STN's position. During its consideration of STN's petition, OFA made no field visits and conducted no interviews of STN members, unlike the assistance previously granted to other tribes. Even after the February 11, 2000 directive was revoked, OFA still made no field visits and conducted no interviews, despite granting such assistance to other tribes. Further, assuming that OFA followed the AS-IA's directive, it was unable to conduct any independent research in support of STN's petition, a practice that was common for OFA.

31.     On May 5, 2000, STN filed another Complaint[5] seeking to restore possession of certain aboriginal and reservation lands located in the Town of Kent, Connecticut under the Nonintercourse Act, 25 U.S.C. § 177. In this action, STN was seeking to restore lands located south of its present day Reservation. The named Defendants are the United States of America and Connecticut Light and Power Company.

32.     On June 28, 2000, STN filed a Motion to Terminate the Stay. On September 11, 2000, the Court granted this Motion, noting that although the BIA's "technical expertise makes it better positioned to make a recognition determination, such expertise is outweighed by its now demonstrated inability to make such determinations in anything remotely resembling a timely

---

5     Civil Action No. 3:00-CV-0820 (PCD)

manner." Based on this order, the Court assumed control over the recognition process and STN's petition.

33.     In response to the Court's ruling, the BIA requested that it remain involved in the recognition process and issue a finding on STN's petition. The Court consented to the BIA's request and instructed the parties and *amici* to develop a scheduling order. After months of intensive negotiations between representatives of the BIA, its lawyers from the Department of the Interior's Office of the Solicitor, the United States Attorney for the District of Connecticut, Connecticut Attorney General Richard Blumenthal and representatives of his office, counsel for STN, all other parties to the consolidated cases and the Court, the Court entered a Scheduling Order on May 8, 2001. The Scheduling Order was intended to govern the scheduling and procedure for the determination of STN's tribal status which was necessary to facilitate the eventual resolution of STN's land claims against the United States and others.

34.     The Scheduling Order, as subsequently amended, incorporated the existing procedures provided for in the Acknowledgment Regulations, 25 C.F.R. Part 83, to determine STN's petition while enforcing a strict timeline for the BIA and OFA to make its determination.

35.     The Scheduling Order specifically provided for the creation of an electronic database by the BIA. The BIA accordingly developed the FAIR (Federal Acknowledgment Information Resource System) database which would include all materials submitted by the parties and *amici* relating to STN's petition and memos and other material reflecting the decisional process undertaken by the BIA staff.

36.     Under the Scheduling Order, the parties and the State of Connecticut, had extraordinary input in BIA's process that far exceeded a normal interested party's input in the acknowledgment process. In particular, the Scheduling Order allowed the parties to do the

-10-

following:  (1) access to the Documented Petition and BIA's administrative file, including

genealogical information; (2) submit input regarding the design of the FAIR database; (3) submit

documents and comments regarding any part of the FAIR database; (4) submit comments,

arguments or documents in response to BIA's proposed findings; (5) request technical assistance;

and (6) request expedited reconsideration before the Interior Board of Indian Appeals ("IBIA").

This level of access was extraordinary because in all previous tribal submissions such data was

not customarily available to interested parties; its disclosure here required STN to waive its right

to privacy with respect to certain documents.

37.    The Scheduling Order also contained the following directive prohibiting *ex parte*

contact:

> (1)    No non-federal party or *amici* shall communicate or meet
> with any officials in the immediate offices of the Secretary of the
> Interior, the Assistant Secretary-Indian Affairs or the Deputy
> Commissioner of Indian Affairs with respect to this petition,
> without notification to the other parties.[6]

38.    On December 5, 2002, OFA issued a Proposed Finding against tribal

acknowledgment following a review of the STN petition, 25 C.F.R. § 83.10(h), finding that the

Tribe had failed to satisfy two key criteria, § 83.7(b) and (c) (community and political authority).

Specifically, it stated that:  "Although Connecticut has recognized the Schaghticoke tribe, this

state relationship does not substitute for the extended periods of time (from the early 1800s-

1875, 1885-1967) where there was little or no direct, specific evidence provided in regard to

---

[6]    After Connecticut Attorney General Richard Blumenthal violated this paragraph on March 17, 2004 (see ¶46, infra), it was subsequently amended by the Court on June 14, 2004 as follows:

> (1)    No non-federal party or *amici* shall communicate or meet with any officials in the immediate offices of the Secretary of the Interior, the Assistant Secretary of the Interior or the Deputy Commissioner of Indian Affairs, without two business days prior notification to the other parties.

(emphasis added).

political authority or influence" and "[t]he petitioner does not meet the regulatory definition of a community between 1940 and 1967 and from approximately 1996 to the present."

39.    STN and all interested parties then participated in the comment process, 25 C.F.R. § 83.10(i). On August 8, 2003, the State of Connecticut filed comments and supporting documents. Various Connecticut towns and organizations, as well as entities with STN connections, including the "Schaghticoke Indian Tribe" ("SIT") (which included a few former STN members and others with no documented genealogy to STN membership) and the "Coggswell family" (comprised of just 4 individuals of the Coggswell lineage, two brothers and their direct offspring, compared with 40 individual Coggswell family members enrolled with STN) also filed comments.

40.    On multiple occasions during the Comment Period, the OFA staff met with STN tribal representatives and their researchers to discuss the issue of individuals who had long been members of the tribal community, but who were not on the tribal roll. In these meetings, the STN representatives admitted having difficulty getting a small number of individuals (about 42), who were likely to be entitled to membership in the Tribe, to make formal application for membership in STN. The OFA encouraged STN to bring in as many of those individuals as possible into membership. However, the OFA also advised STN that, to whatever extent this was not possible, the Tribe could present a stronger case on this issue by making changes to the tribal constitution that would allow this small number of individuals a window of opportunity to apply for membership in STN. The STN followed the OFA's advice, making extensive efforts to reconcile with the unenrolled tribal community members and get them to apply for membership. Eventually, STN met with some success, and 11 of these individuals applied for membership in STN. To make provision for those who were unwilling to apply for membership, the STN met

and amended its Constitution to qualify these 42 individuals for membership as suggested by OFA.

41.    Under the Acknowledgment Regulations, 25 C.F.R. §§ 83.10(i), 83.10(k), STN had an opportunity to respond not only to the Proposed Finding, but also to the Interested Parties' comments on the Proposed Finding.  STN's research team made an extraordinary effort to address concerns raised by OFA in the Proposed Finding.  The research conducted during this period included genealogical and historical archival research at the local, State, and national levels, as well as anthropological archival research and numerous ethnographic interviews with living members of the Tribe.  Extensive analysis of all the data gathered (regarding residential and marriage patterns, political action by tribal leaders, and the importance of the relationship between the State of Connecticut and STN as an indicator of exercising political influence).  On September 29, 2003, based on this research, STN submitted its response which included voluminous supplemental documentation as well as additional analysis and argument in support of a determination that STN had, with its new materials, satisfied all of the mandatory criteria under the regulations.  The positive Final Determination found this evidence to be sufficient to meet the evidentiary burden required by the regulations.

42.    On January 29, 2004, in accordance with Paragraph (h) of the Scheduling Order, the Principal Deputy Assistant Secretary - Indian Affairs, Aurene Martin, notified STN and all interested parties of the Final Determination to Acknowledge the existence of STN as a tribe.  25 C.F.R. § 83.10(m).  That Final Determination was published in the Federal Register on February 5, 2004. 69 Fed. Reg. 5570 (Feb. 5, 2004).

43.    The FAIR database released by the BIA after the Final Determination included an internal memorandum from BIA staff to the AS-IA regarding options and advice.

-13-

44.     Thereafter, as required by Paragraph (j) of the Scheduling Order, the parties and *amici* engaged in further negotiations regarding whether to implement administrative review through reconsideration before the IBIA (25 C.F.R. § 83.11) or whether subsequent review would be accomplished instead before the Court under the APA (5 U.S.C. § 551 et seq.). The parties and *amici* agreed that the IBIA review procedures would be available and that any additional review under the APA with the Court would be filed only at the end of the administrative proceedings when the agency decision was final and effective.

45.     On March 12, 2004, Connecticut Senator Christopher Dodd sent a letter to the Office of Inspector General ("OIG") requesting that the OIG conduct an investigation into the BIA's Final Determination to recognize STN.  In response to this letter, OIG initiated an investigation.  Subsequently, the OIG received a request from Secretary Norton asking the OIG to give this matter high priority given its importance and the concerns raised.  On August 27, 2004, Inspector General Earl E. Devaney sent a memorandum to Secretary Norton summarizing the results of the OIG investigation.  This memorandum concluded that "no outside influence or personal bias affected the decision to grant acknowledgment to the STN" and "although the STN acknowledgment decision was highly controversial, we found that OFA and the Principal Deputy Assistant Secretary - Indian Affairs conducted themselves in keeping with the requirements of the administrative process." Also on August 27, 2004, the Inspector General responded to Senator Dodd's letter similarly summarizing the results of his investigation.

46.     On March 17, 2004, Connecticut Attorney General Richard Blumenthal arranged, without the proper notice violating paragraph (1) of the Scheduling Order, a private meeting with Respondent Secretary Norton.  At that meeting, he hand delivered a letter, regarding the STN's petition for recognition and of its pending agency appeal.  The other parties received the letter

-14-

days later via U.S. mail. After seeing the letter, counsel for STN moved to amend paragraph (1) to clarify that "notice" in that Paragraph meant prior notice. On June 14, 2004, the Court issued a ruling on that motion. In that ruling, the Court noted that "[s]uch conduct [making contact with decisionmaking officials], at the very least, appears improper and thus threatens to subvert the integrity of the appeal process itself."

47.     On May 3, 2004, the State of Connecticut, jointly with parties, the Kent School Corporation, CL&P, and the town of Kent, and interested parties, the towns of Danbury, Bethel, New Fairfield, Newton, Ridgefield, Stamford, Greenwich, Sherman, Westport, Wilton, Weston and the Housatonic Valley Council of Elected Officials, SIT and the Coggswell family filed Requests for Reconsideration of the Final Determination with the IBIA, 25 C.F.R. § 83.11.

48.     On May 5, 2004, the United States House Government Reform Committee held a hearing on the process for recognition of Indian tribes. In his opening statement, Chairman Tom Davis acknowledged that the reason for the hearing was based on concerns raised by the Connecticut Congressional delegation with respect to the recognition of STN and the Eastern Pequot tribes. Specifically, Chairman Davis stated that:

> The Connecticut Congressional delegation recently brought to my attention two BIA recognition petitions filed by Connecticut tribes and asked the Committee to hold a hearing to explore questions about the objectivity and transparency of the BIA recognition process in connection with the decisions to recognize the Historical Eastern Pequot and the Schaghticoke tribes.
>
> *     *     *
>
> Both the Schaghticoke and Historical Eastern Pequot decisions are being challenged on various grounds by the Connecticut Attorney General, municipalities subject to Indian land claims, and other interested parties. In both cases, final recognition was granted by the Assistant Secretary for Indian Affairs despite proposed findings by the BIA that the tribes did not meet one or more of the seven mandatory criteria for status as a sovereign Indian nation.

>                      *        *        *

> Our goal today is to look at these decisions as a case study of the
> overall recognition process. Are these cases unique, or are they
> symptomatic of larger problems that call into question the integrity
> and fairness of the process? Do these cases demonstrate that the
> ground rules underlying the process are ever changing?

49.     At this hearing, Attorney General Blumenthal testified criticizing the BIA's

recognition for STN and the Historical Eastern Pequots. Specifically, he testified that "Congress

should enact a moratorium on Bureau of Indian Affairs (BIA) tribal acknowledgment decisions

or appeals affecting Connecticut...and initiate a full and far-reaching investigation of the BIA's

actions." OFA Director R. Lee Fleming was present at this hearing and Theresa Rosier,

Counselor to the AS-IA, testified on behalf of the Department of the Interior. In response to a

question about STN and the Historical Eastern Pequot determinations, Ms. Rosier responded

that:

> Although I can't talk about the specifics of those situations, since
> they are both at IBIA appeal and Schaghticoke is under an
> inspector general investigation, I can talk to the generalities. We
> feel that our petitions speak for themselves, and that the proposed
> finding gave them an opportunity to cure their deficiencies, and
> they did that.

During the hearing, Director Fleming and Ms. Rosier witnessed the open hostility towards the

BIA, the federal acknowledgment regulations and the Final Determination recognizing STN.

This open hostility observed during the hearing undoubtedly impacted subsequent decisions by

OFA with respect to STN.

50.     On November 29, 2004, STN submitted its response to the IBIA opposing all of

the Requests for Reconsideration, 25 C.F.R. § 83.11. Pursuant to § 83.11, STN had a right to

seek reconsideration of the Final Determination.

51.     On December 2, 2004, just three days later and eleven months after the positive Final Determination, without time to analyze STN's submission, OFA filed an unprecedented "Supplemental Transmittal" memorandum with the IBIA calling into question its own Final Determination.  Specifically, it questioned the endogamy analysis that it had used in the Final Determination to support its finding that STN had met the burden of proof for the community and political authority criteria of the recognition regulations.  OFA provided no adequate explanation for its change in position and no clear statement of how this position would affect the ultimate disposition of the matter.  This Supplemental Transmittal urged IBIA not to affirm the Final Determination "absent explanation or new evidence." Had STN known that OFA would disclaim its own Final Determination, STN would have exercised its right to seek reconsideration of the Final Determination.  OFA effectively deprived STN of their right to seek reconsideration by waiting until three days after STN filed its response to the requests for reconsideration to issue the Supplemental Transmittal.

52.     The Supplemental Transmittal also suggested that OFA may have unintentionally deviated from "prior precedent in calculating the rates of marriages under 83.7(b)(2)(ii)..." for the STN's endogamous marriage rates for part of the 19th Century.  In light of this alleged mistake, the Supplemental Transmittal concludes that the "analysis under 83.7(b)(2)(ii) in the Summary [under the Criteria for the Final Determination]...should not be affirmed on these grounds absent explanation or new evidence."

53.     Despite this extraordinary admission of apparent error, from OFA's team of experts, the Supplemental Transmittal made no attempt to resolve the confusion it created.  It did not explain how STN endogamous marriage rates were calculated for the Final Determination, how following any different precedent might have caused the rates to be calculated differently,

-17-