or what effect this change would have on the outcome of the determination. Moreover, OFA's changed analysis conflicted with its long established guidelines and practice. The timing of this filing also prevented STN from being able to make any response to the Supplemental Transmittal.

54. On January 3, 2005, STN requested technical assistance concerning the meaning and effect of OFA's Supplemental Transmittal. OFA rejected this request for assistance on January 10, 2005. On February 3, 2005, STN filed a Motion for Clarification with the IBIA, arguing that the IBIA could not properly evaluate the record when OFA itself had withdrawn a portion of its decision, but had not explained or replaced its reasoning, nor had it clarified the resulting effect on the Final Determination. That Motion was ignored by the IBIA.

55. On January 23, 2005, an Associated Press release revealed that a group called Town Action to Save Kent ("TASK") had hired a prominent Washington D.C. lobbyist firm, Barbour, Griffith & Rogers, to assist in its efforts to overturn STN's federal recognition. The press release further noted that TASK members met with, among others, a representative of Barbour, Griffith & Rogers, a Selectwoman of the Town of Kent and representatives from the State of Connecticut - - the latter two entities being parties to the consolidated cases.

56. In addition to these news reports, Barbour, Griffith & Rogers registered with the U.S. Congress as a lobbyist for TASK in December 2004 to "provide guidance and counsel on issues involving Indian gaming and federal tribal recognition." Further, it had been reported in a subsequent news article that another Selectwoman of the Town of Kent was actually a founding member of TASK.

57. The law firm Perkins Coie had also previously registered as a lobbyist on behalf of the Housatonic Valley Coalition[7]. Its February 2004 lobbying report discloses contacts during 2003 with the Department of the Interior and the Bureau of Indian Affairs.

58. On February 17, 2005, based on these news reports, STN moved the Court to allow limited discovery under the May 8, 2001 Scheduling Order. The purpose of the motion was so that STN could explore whether the Town of Kent, the State of Connecticut and potentially other Defendants had violated the Scheduling Order which prohibits meeting or contacting officials of the Department of the Interior.

59. The result of these lobbying efforts against STN's federal recognition included an extraordinary letter sent by U.S. Representatives Nancy Johnson, Christopher Shays and Rob Simmons to the IBIA on February 10, 2005. The letter urged the IBIA to act to overturn the STN's positive Final Determination.

60. On March 3, 2005, Congresswoman Johnson even introduced legislation (H.R. 1104) attempting to overturn the AS-IA's decision to recognize STN as a tribe - - the first termination bill since federal repudiation of the termination policy nearly 50 years ago. The bill stated that the AS-IA reached its positive Final Determination on STN "only through the... explicit, premeditated manipulation of both the evidence and established acknowledgment standards." H.R. 1104, Sec. 2(a)(4)(A).

61. On May 11, 2005, the United States Senate Committee on Indian Affairs held an Oversight Hearing on the Federal Recognition of Indian Tribes. During that hearing, which featured testimony from OFA Director R. Lee Fleming as well as from the Connecticut

---

[7] The membership of the "Housatonic Valley Coalition" is made up of several Connecticut Municipalities and a consortium of municipal officials, including the City of Danbury, the Towns of Bethel, Brookfield, New Fairfield, Newtown, and Ridgefield and the Housatonic Valley Council of Elected Officials. The request for reconsideration of the STN Final Determination filed before the IBIA by the Connecticut Attorney General on May 3, 2004, was submitted on behalf of each of these members of the Housatonic Valley Coalition, with the exception of the Town of Brookfield.

Congressional Delegation, Connecticut Governor M. Jodi Rell and Attorney General Blumenthal both attacked the federal recognition process as fatally flawed, lawless and illogical. Specifically, Attorney General Blumenthal submitted testimony suggesting that Congress abolish the OFA's tribal recognition authority and impose an immediate six month moratorium on all recognition decisions. Governor Rell testified that the "Bureau of Indian Affairs is awarding federal recognition to Indian tribes regardless of evidence to the contrary" and "historical reservation lands no longer exist as such, and haven't for well more than 200 years. They are now cities and towns, filled with family homes, churches, school, shopping areas and the like." At the same time, Rell praised the "hard work and entrepreneurial spirit" of the Mohegans and Mashantucket Pequots, who operate two of the world's largest casinos, and turn over $400 million annually to the State.

62.   During that same hearing, Connecticut Senator Joseph Lieberman attacked the STN Final Determination as an example of a "process that smacks of outright manipulation and abuse of government authority." Congresswoman Johnson stated that OFA's "erroneous and unlawful decision to acknowledge the Schaghticoke Tribal Nation of Kent…was made by ignoring evidence, manipulating federal regulations and overturning precedent."[8] Congressman Shays stated that "[t]he bottom line is, until the special interests of wealthy casino developers and investors are held accountable, tribes such as the Schaghticoke will continue to get federal recognition when it's clear they do not meet the criteria" and that "the granting of federal recognition to state tribes is analogous to giving them a license to print money." Finally, Congressman Simmons stated that "[i]ndeed, there is no better example of this disregard for the regulations in place than in the case of the Schaghticoke decision."

---

[8]   Congresswoman Johnson concluded her remarks by urging that the Senate "Committee not only look toward reforming the BIA recognition process, but also correcting its past failures, as in the Schaghticoke case."

63.     On May 12, 2005[9], just one day after the Oversight hearing and without further input from STN, the IBIA issued its decision to vacate and remand the Final Determination.

64.     On May 20, 2005, the Court granted STN's Motion for Permission to Conduct Limited Discovery and set an October 1, 2005 deadline for the completion of such discovery. Following this Court order, STN was able to take some discovery. This discovery revealed an e-mail, dated January 10, 2005, from TASK to the First Selectwoman for the Town of Kent which discussed a coordinated strategy between TASK, the Town of Kent, the Governor, the State Congressional delegation, the Attorney General and local officials with regards to the Department of the Interior and the BIA. Similar e-mails were also discovered. However, when STN noticed depositions and sought documents from TASK and Barbour, Griffith and Rogers, they resisted. Specifically, they moved to quash their depositions and for a protective order, seeking to shield themselves from producing any documents and answering relevant questions. These depositions never moved forward. TASK and Barbour, Griffith and Rogers never disclosed any documents.

65.     Following the IBIA's May 12, 2005 decision, STN renewed its request for technical assistance and an opportunity to confront and respond to OFA's new analysis of critical issues supporting the Positive Finding on criterion (c) (25 C.F.R. § 83.7(c)) for a substantial period of the relevant record.

66.     Despite the startling Supplemental Transmittal, the secrecy surrounding OFA's change of position, and the absence of an opportunity for STN to respond to the changed context of the Request for Reconsideration before the Final Determination was vacated, the Acting Principal Deputy Assistant Secretary-Indian Affairs ("AS-IA"), Michael Olsen, issued a letter on

---

[9] On the same day, the IBIA also issued its decision to vacate and remand the Final Determination for the Historical Eastern Pequot Tribe.

May 23, 2005, setting forth a restrictive set of procedures that would govern the Reconsideration on remand from the IBIA. Specifically, the remand procedures rejected STN's request for a technical assistance meeting to clarify the Supplemental Transmittal, and similarly prohibited consultation, unsolicited arguments, evidence, comments and/or briefings.

67.   On June 15, 2005, STN objected to these unfair and restrictive procedures and moved the Court to modify them.

68.   On July 23, 2005, the Court entered an order that amended the Scheduling Order and allowed the parties and *amici* to submit limited additional evidence and briefs. The Court's order set forth the following deadlines:

- OFA shall provide a technical assistance letter to the parties on or before July 14, 2005.

- On or before July 25, 2005, the parties may submit to the OFA historical documents or historical evidence concerning marriages of Schaghticoke members as well as any specific documents requested in the technical assistance letter.

- Parties may submit briefs on or before August 12, 2005, not to exceed 25 pages providing argument and analysis.

- The Assistant Secretary shall extend the time frame for issuing the reconsidered decision on or before October 12, 2005.

69. On July 25, 2005, consistent with the Court's amended order, STN submitted additional documents and material in four separate envelopes. The cover letter accompanying these documents identified the contents of each envelope:

> The first group are documents that OFA had requested in its July 14, 2005 technical assistance letter, including the overseer's reports with transcripts.
>
> As for the second group of documents and material, it contains historical documents relating to the endogamous marriage rate issue for the early part of the 19th century. This group also contains an 1834 Hermethenean [sic] article that specifically pertains to the political authority criterion for the same time period. In addition, this group contains a Compact Disc with an updated Family Tree, based on the new information.
>
> The third group of documents contained other relevant information and documents. During our search concerning the marriage rate issue, we found other historical documents dealing with the Tribe in the first half of the 19th century. These documents include reports on court cases dealing with tribal members. It also contains additional reports on the Tribe's accounts being handled by an overseer.
>
> With respect to the fourth group of documents, they will be referenced to in the STN's brief that is due August 14, 2005. These are included today simply for ease of reference. The group has two subparts. The first subpart contains both a 1904 report of Connecticut Temporary Examiner of Public Records and a compilation assembled by the Connecticut Genealogical Association, which compilation indicates that vital records of the Town of Kent for the relevant period, 1795 to 1850, can no longer be found. The second subpart contains a sampling of Anthropological technical literature supporting the Tribe's position as to the correct method for computing endogamous marriage rates. These articles are from respected scientific journals and are relied upon by Anthropologists, Sociologists and other social scientists in the field.

70. On July 26, 2005, Barbara Coen, an attorney from the Department of the Interior's Office of the Solicitor, faxed a letter to STN's attorneys stating that she had advised OFA not to open envelopes two through four because she believed "only the first set of

documents and a portion of the second set appear to be within the scope of material permitted" by the Court's order. STN was never informed whether the relevant envelopes two through four were ever opened or reviewed.

71.     On August 12, 2005, STN submitted its brief to OFA pursuant to the Court's order.

72.     On October 12, 2005[10], OFA announced via fax its Reconsidered Final Determination denying STN's petition which was then published in the Federal Register on October 14, 2005. 70 Fed. Reg. 60101 (2005). OFA found that STN did not meet criterion 83.7(b), community, because there was insufficient evidence for the periods 1920-1967 and 1997 to the present. It also found that STN did not meet criterion 83.7(c), political authority or influence, because there was insufficient evidence for the periods 1801-1875, 1885-1967, and 1997 to the present. OFA's stated basis that STN failed to meet these criteria from 1997 to the present was because SIT members refused to become members of STN. OFA also refused to rely on the relationship between the State of Connecticut and STN as additional evidence of social interaction or political influence to satisfy the criteria.

73.     Following this decision, STN requested an updated copy of the FAIR database which would add all documents submitted by the parties and *amici* and all documents created by the OFA in connection with the Reconsidered Final Determination.

74.     STN requested an updated copy of the FAIR database so that it could consider any new documents in advance of the filing of this petition. Specifically, STN wanted to consider any internal memoranda generated by BIA or OFA staff advising the AS-IA on the

---

[10] Also on October 12, 2005, the BIA announced its Reconsidered Final Determination denying the Historical Eastern Pequot Tribe's petition for federal acknowledgment.

Reconsidered Final Determination, similar to the memorandum included in the FAIR database released after the positive Final Determination see ¶43 supra).

75.   OFA refused to provide an updated copy of the FAIR database. It claimed that STN was not entitled to an updated copy of the FAIR database until after it filed its petition for review. Until STN is able to review an updated copy of the FAIR database, it will not be able to determine what OFA reviewed or did not review before issuing the Reconsidered Final Determination.

## ISSUES PROPOSED TO BE RAISED ON PETITION FOR REVIEW

76.   The APA, under 5 U.S.C. § 706(1), and the Scheduling Order empower this Court to compel the AS-IA to recognize STN as an Indian tribe if such recognition was unlawfully withheld. In the alternative, the APA, under 5 U.S.C. § 706(2), and the Scheduling Order empower this Court to set aside the Reconsidered Final Determination if it is arbitrary and capricious, constitutes an abuse of discretion or is contrary to the laws and regulations governing the Department of the Interior and the OFA with respect to the federal acknowledgment process.

77.   The actions described in this appeal leading up to the Reconsidered Final Determination violate the APA because they are arbitrary and capricious, constitute an abuse of discretion, are contrary to the laws and regulations governing the Department of the Interior and the OFA with respect to the federal acknowledgment process, violated STN's rights to procedural due process, breached the United States' federal trust obligation to STN as an Indian tribe, and are the product of unlawful political influence and congressional interference.

78.   Specifically, STN identifies the following actions in support of its appeal:

(a)   James Cason's actions with respect to the Reconsidered Final Determination are null and void because they constituted ultra vires actions of an unauthorized

individual. In October 2005, at the time Mr. Cason purported to decide the Reconsidered Final Determination denying STN federal recognition, Mr. Cason was (1) serving as "Associate Deputy Secretary" of the Department of the Interior in violation of the Appointments Clause of the Constitution, see U.S. Const. Art. II, sec. 2, and/or (2) was delegated responsibility to serve as the Acting Assistant Secretary for Indian Affairs in violation of the provisions of the Vacancies Reform Act, 5 U.S.C. § 3345, et seq.

   (b) OFA's Supplemental Transmittal memorandum and subsequent actions leading to the Reconsidered Final Determination constituted a denial of procedural due process. The memorandum modified the Final Determination, but did so only after the briefing had been completed in the appeal before the IBIA. The IBIA denied STN's request for further clarification and, therefore, deprived the Tribe of its right, provided under the regulations, to appeal a negative final determination. It also prevented STN from seeking reconsideration of the issues decided adversely to them. Because STN did not have adequate notice of the effective Final Determination, as modified by the Supplemental Transmittal memorandum with its recommendation that the IBIA not affirm the Final Determination, it was deprived of the ability to fully avail itself of the opportunity to appeal that determination, submit evidence not previously considered, and argue its position to the IBIA.

   (c) The OFA's Supplemental Transmittal memorandum and subsequent actions leading to the Reconsidered Final Determination, along with the IBIA's decision to vacate and remand the Final Determination demonstrates that the wrong burden of proof was applied. 25 C.F.R. § 83.6(d) states that:

> A criterion shall be considered met if the <u>available evidence establishes a reasonable likelihood</u> of the validity of the facts relating to that criterion. <u>Conclusive proof of</u>

>> the facts relating to a criterion shall not be required in order for the criterion to be met.

Further, § 83.6(e) provides:

>> Evaluation of petitions shall take into account historical situations and time periods for which evidence is demonstrably limited and not available. The limitation inherent in demonstrating the historical existence of community and political influence or authority shall also be taken into account. ...this demonstration does not require meeting those criteria at every point in time.

The Supplemental Transmittal memorandum, IBIA's decision to vacate and remand, and the Reconsidered Final Determination ignore these provisions, departing from prior precedent of decade by decade analysis, and requiring evidence for multiple points within a decade. These actions also reflect that AS-IA, OFA and IBIA adhered to a requirement of conclusive showing on each criterion, departing from the regulations which only require a "reasonable likelihood." This sudden and unexpected departure from the regulations and precedent was contrary to law and an abuse of discretion.

(d)     The Reconsidered Final Determination ignored probative evidence submitted by STN during the appeal of the Final Determination and on reconsideration. Specifically, STN submitted significant evidence for the 19th and early 20th centuries that demonstrated the Tribe's management of Reservation resources (i.e. land and timber) all of which demonstrate communal and political tribal activity and were ignored by the OFA and AS-IA. This decision was arbitrary and capricious.

(e)     The Reconsidered Final Determination applied an arbitrary and capricious statistical analysis of marriage patterns. The OFA's method for evaluating marriages is inconsistent with its own guidelines and precedent and contrary to the standard method used to evaluate marriage data in all of social science statistical practice.

(f) OFA's refusal to provide STN with the updated FAIR database after the Reconsidered Final Determination effectively denied STN's access to the complete administrative record and, therefore, its ability to frame the issues for the Court to consider as part of the APA review. This decision violated STN's right to procedural due process.

(g) The Reconsidered Final Determination departs from the OFA's own prior decisions regarding inter-tribal factional conflict. The OFA improperly held these factional issues against STN. However, in previous tribal decisions, the OFA has used factional issues to demonstrate the active political life in the tribe. This decision was arbitrary and capricious.

(h) The directive issued by the AS-IA on February 11, 2000 (65 Fed. Reg. 7052) greatly impaired OFA's understanding of tribal petitions and constitute a violation of the APA, without due process. In addition, this directive violated the United States government's federal trust obligation to STN. The February 11, 2000 directive effectively enacted a rule without allowing for notice and comment. It adversely impacted STN's petition because it prevented OFA staff from making field visits, conducting interviews, and engaging in independent research to evaluate and potentially assist in the substance of STN's petition. This lack of activity led to an inadequate understanding by OFA of STN's petition.

(i) The Reconsidered Final Determination improperly dismissed all the evidence relied upon in the Final Determination regarding STN's recognition by and active interaction with the State of Connecticut.

STN's relationship with the State of Connecticut is continuous for a period that began before there was even a State of Connecticut or United States government. During that period, the State assumed responsibility for administering funds and services to tribes and their lands within the State and was responsible for oversight of the STN Reservation, and provided

services to tribal members wholly based on their status as tribal members. The State's role usurped some aspects of what had been traditional tribal governance responsibilities, but did not wholly eliminate tribal political existence. The very fact of a continuing community that struggled to preserve and control tribal resources, often despite the adverse actions of the State, is evidence that the body politic continued throughout State dominance.

Indeed, STN has continually maintained its 400 acre Reservation in the Town of Kent, Connecticut and controlled the allocation of its resources, including housing, development and the burial of tribal members in the continually used cemetery. The IBIA's decision did not preclude OFA from relying on state recognition as evidence of tribal existence, but rather sought OFA's clarification of the probative value of such evidence. Without explanation, OFA chose to dismiss all such evidence or analysis of the factual record rather than explore its value for any particular time period. This action was arbitrary and capricious.

(j) On multiple occasions, OFA staff met with STN and their researchers to discuss the issue of individuals who had long been members of the tribal community, but who were not on the tribal roll (about 42 individuals). OFA advised STN to changed its Constitution to allow these individuals to apply for membership in STN. The STN followed this advice, making efforts to reconcile with these individuals and ultimately amending its Constitution. In the positive Final Determination, the AS-IA concluded that STN responded to OFA's concerns on this issue, and recognized the Tribe. However, in the Reconsidered Final Determination, the AS-IA inexplicably reversed the OFA's position on this issue. The AS-IA concluded inaccurately that there were people on the STN membership roll who had not applied for membership, and that there were too many members who were not enrolled at all. Neither of

these conclusions are accurate. Further, the reversal of OFA's position on this issue without explanation was arbitrary and capricious.

(k) The Department of the Interior, the AS-IA, BIA, OFA and the IBIA's treatment of STN throughout the recognition process breached its federal trust obligation to STN. Specifically, they violated their own regulations, disregarded prior precedent, ignored evidence submitted by STN, and allowed their decisions to be based on political influence from state and federal government officials and others rather than solely on the administrative record.

(l) The actions and decisions of the Department of the Interior, AS-IA, BIA, OFA and IBIA were impacted by undue political influence from state and federal government officials, political lobbyists, advocacy groups, especially TASK, Barbour, Griffith and Rogers, and other persons. This undue political influence resulted in the OFA filing an unprecedented "Supplemental Transmittal" memorandum questioning its own Final Determination, the IBIA's decision to vacate and remand the Final Determination back to the OFA with newly created acknowledgment criteria and the Reconsidered Final Determination which reversed the AS-IA's original decision to recognize STN. In short, since the Final Determination, the actions of the Department of the Interior, BIA, OFA and IBIA have been based on heavily weighted political influence and they have not exercised independent judgment as required by the APA and the Acknowledgment Regulations.

(m) The decision making processes of the AS-IA, OFA and IBIA were improperly influenced by direct and focused congressional interference that shaped the agency's consideration of the merits of the STN petition. Interference by the Members of the Connecticut Congressional Delegation tainted the administrative process in a manner that has violated the STN's right to due process at law.

**RELIEF SOUGHT**

79. Pursuant to 5 U.S.C. § 706(1), STN respectfully requests that this Court grant its appeal and order the Department of the Interior and the AS-IA to reinstate the Final Determination recognizing STN as an Indian tribe under the Federal Acknowledgment Regulations, 25 C.F.R. Part 83.

80. In the alternative, pursuant to 5 U.S.C. § 706(2), STN respectfully requests that this Court grant its appeal and set aside the Reconsidered Final Determination. STN further requests that this Court retain control over STN's petition or refer the matter to a Magistrate Judge or a Special Master to determine whether or not STN is a federally recognized tribe. This relief is warranted based on the evidence of undue political influence and congressional interference that led to the decision to overturn the positive Final Determination and issue the Reconsidered Final Determination. If the Reconsidered Final Determination is merely remanded the Department of the Interior and the OFA, it is likely that STN's rights to due process, as well as its rights under the APA and the Acknowledgment Regulations will be violated again.

81. Finally, if this Court does not grant the relief requested in Paragraph 79 or 80, STN respectfully requests that this Court grant its appeal, set aside the Reconsidered Final Determination, and remand the Reconsidered Final Determination back to the Department of the Interior and the OFA with direction to allow STN a full opportunity to exercise its due process rights under 25 C.F.R. § 83.11 and its rights under the APA as if the Reconsidered Final Determination were a negative final determination.

THE PETITIONER,
SCHAGHTICOKE TRIBAL NATION

By: _____
Thomas J. Murphy (ct07959)
Steven D. Ecker (ct03762)
Andrew D. O'Toole (ct20015)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com
ecker@cemlaw.com
aotoole@cemlaw.com

Vernle Durocher, Jr., Esq
Thomas M. Jancik, Esq.
Glenn M. Salvo, Esq.
Dorsey & Whitney, LLP
50 South Sixth Street,
Suite 1500
Minneapolis, MN 55402-1498
(612) 340-2600 (phone)
(612) 340-2868 (fax)
durocher.skip@dorsey.com
jancik.thomas@dorsey.com
salvo.glenn@dorsey.com

Of Counsel:

Judith A. Shapiro, Esq.
6856 Eastern Ave., NW
Suite 206
Washington, DC 20012
(202) 723-6400 (phone)
jshapirolaw@earthlink.net

## CERTIFICATION

I hereby certify that on March 30, 2007, I caused a copy of foregoing First Amended Petition for Review to be filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____
Thomas J. Murphy