SCHAGHTICOKE TRIBAL NATION,　　　:
　　　　Petitioner,　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　　:　　　Case No. 3:06-cv-00081 (PCD)
　　　　　　　　　　　　　　　　　:
DIRK KEMPTHORNE, Secretary,　　　　:
Department of the Interior, ET AL.,　　　:
　　　　Respondents,　　　　　　　:
　　　　　　　　　　　　　　　　　:
STATE OF CONNECTICUT, KENT　　　:
SCHOOL CORPORATION, THE　　　　:
CONNECTICUT LIGHT AND POWER　:
COMPANY, and TOWN OF KENT,　　　:
　　　　Intervenor-Respondents.　　:

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case concerns the politically loaded question of whether the Schaghticoke Tribal

Nation ("STN" or "Petitioner") constitutes an Indian tribe within the meaning of federal law as

provided in the federal acknowledgment regulations, 25 C.F.R. Part 83 (1994).  On October 11,

2005, Associate Deputy Secretary of the Interior James E. Cason issued a Reconsidered Final

Determination (the "RFD") concluding that the STN did not meet the federal acknowledgment

requirements.  On January 12, 2006, STN filed a petition for review in this Court claiming that

the Department of the Interior's RFD was arbitrary and capricious under the Administrative

Procedure Act (APA), the result of improper political influence in violation of STN's due

process rights, and the product of an ultra vires decision in violation of the Appointments Clause

of the United States Constitution and of the Vacancies Reform Act.  After conducting extra-

record discovery upon permission from the Court, Petitioner filed a motion for summary

judgment.  Respondents Dirk Kempthorne, Secretary of the Interior; James Cason, Associate

Deputy Secretary of the Interior; the United States Department of the Interior (the "Department"

or "DOI"); the Bureau of Indian Affairs ("BIA"); the Office of Federal Acknowledgment ("OFA"); and the Interior Board of Indian Appeals ("IBIA") (collectively, the "Federal Respondents") filed a cross-motion for summary judgment. Intervenors the State of Connecticut, Kent School Corporation, The Connecticut Light and Power Company, and the Town of Kent (collectively the "Intervenors" or "Intervenor-Respondents"), who participated as interested parties in the administrative proceedings before the DOI, also filed a cross-motion for summary judgment.[1] Because the Court is able to resolve the pending motions on the papers, Petitioner's request for oral argument is denied. For the reasons stated below, Petitioner's Motion for Summary Judgment [Doc. No. 165] is **denied,** and Respondents' Cross-Motion for Summary Judgment [Doc. No. 178] and the Intervenor-Respondents' Cross-Motion for Summary Judgment [Doc. No. 174] are **granted.** Respondents' Motion to Strike [Doc. No. 182] is **granted in part** and **denied in part.**

## I.      MOTION TO STRIKE

Before delving into the merits of the case, the Court must resolve the scope of the record before it. The Respondents and Intervenor-Respondents have moved pursuant to Rule 56(e) to strike 19 documents submitted by Petitioner in support of its motion for summary judgment.[2]

_____

[1]      Kent School Corporation, The Connecticut Light and Power Company, and the Town of Kent are defendants and the State is an *amicus* in two land claim suits brought by STN under the Non-Intercourse Act, Schaghticoke Tribal Nation v. Kent Sch. Corp., et al., No. 3:98-cv-01113 (PCD), and Schaghticoke Tribal Nation v. Schaghticoke Indian Tribe, et al., No. 3:00-cv-00820 (PCD). These cases were consolidated with the lead case, United States v. 43.47 Acres Of Land, et al., No. 2:85-cv-01078 (PCD), filed on December 16, 1985, in which the United States seeks to condemn certain lands adjacent to the Schaghticoke state reservation for the Appalachian Trail. All three land claim suits involve the question of whether the STN is an Indian tribe under federal law.

[2]      Respondents also move to strike the two exhibits attached to Petitioner's memorandum in support of its motion, a time line and a graphic created by Petitioner to assist the Court in understanding the facts of the case. The Court will treat the exhibits as part of Petitioner's memorandum,

Rule 56(e) provides that on a summary judgment motion, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); see also Local R. 56(a)(3). "The principles governing admissibility of evidence do not change on a motion for summary judgment.... Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Merry Charters, LLC v. Town of Stonington, 342 F. Supp. 2d 69, 75 (D. Conn. 2004) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)). "A motion to strike is the correct vehicle to challenge materials submitted in connection with a summary judgment motion." Newport Elecs., Inc. v. Newport Corp., 157 F. Supp. 2d 202, 208 (D. Conn. 2001). "[A] motion to strike is appropriate if documents submitted in support of a motion for summary judgment contain inadmissible hearsay or conclusory statements, are incomplete, or have not been properly authenticated." Spector v. Experian Info. Servs. Inc., 321 F. Supp. 2d 348, 352 (D. Conn. 2004) (citations omitted); see also Hollander v. Am. Cyanamid Co., 999 F. Supp. 252, 255-56 (D. Conn. 1998). For the reasons that follow, Respondents' motion to strike is granted in part and denied in part.

The Respondents first move to strike all of the contested documents on the basis that they are outside the administrative record. When reviewing an agency decision pursuant to the Administrative Procedure Act, a court is generally confined to the administrative record compiled by the agency when it made its decision. Citizens to Preserve Overton Park v. Volpe,

---

an argument to consider but to accept as undisputable only to the extent it is supported by evidence in the record.

401 U.S. 402, 419-20 (1971).  However, in some circumstances, as in this case, parties are

permitted to conduct discovery beyond the administrative record.  See Schaghticoke Tribal

Nation v. Norton, No. 3:06-cv-0081 (PCD), 2007 WL 867987, at *5 (D. Conn. March 19, 2007)

(citing Sokaogon Chippewa Comm'y (Mole Lake Band of Lake Superior) v. Babbitt, 961 F.

Supp. 1276, 1281 (W.D. Wis. 1997)).  Evidence now presented by Petitioner outside the

administrative record but pursuant to this Court's prior discovery rulings may be considered to

the extent it satisfies the evidentiary admissibility rules, see Sokaogon, 961 F. Supp. at 1283,

especially since Respondents themselves have relied on evidence uncovered through discovery

and outside the administrative record.  See id. at 1286.

Respondents' motion to strike the declarations of Judith A. Shapiro, Aurene Michelle

Martin, William J. Gullotta, and Steven L. Austin is denied.  Even if a declaration would not be

admissible at trial, a court may consider it on a summary judgment motion if it is based on

personal knowledge and sets forth facts to which the declarant could testify at trial and that

would be admissible in evidence.  Fed. R. Civ. P. 56(e).  The declarations challenged by

Respondents' motion to strike are all based on personal knowledge and are therefore appropriate

for review at this time.  Respondents argue that Shapiro's declaration contains information

relayed by former Department official Aurene Martin which constitutes inadmissible hearsay.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. (801)(c).

However, under Rule 801(d)(2)(D) of the Federal Rules of Evidence, an out-of-court statement is

not hearsay if it is "a statement by the party's agent or servant concerning a matter within the

scope of the agency or employment, made during the existence of the relationship."  Fed. R.

Evid. 801(d)(2)(D).  The statements by Ms. Martin captured in Attorney Shapiro's declarations were made regarding her employment as Principal Deputy Assistant for Indian Affairs regarding the STN acknowledgment decision, unquestionably matters within the scope of her employment at the Department of the Interior, a party to this case.  These statements are therefore admissible as party admissions, even though Ms. Martin was no longer employed as the Principal Deputy Assistant in 2007 when she made these statements to Attorney Shapiro.  See Limone v. United States, 497 F. Supp. 2d 143, 163 n. 31 (D. Mass. 2007) (finding testimony of currently unavailable FBI agents before House Committee on Government Reform admissible as party admissions over government's hearsay objection, even though at time of testimony agents were no longer employed by government); see also In re Jacoby Airplane Crash Litigation, No. 99-6073 (HAA), 2007 WL 2746833 , at *4-5  (D.N.J. Sept. 19, 2007) (collecting cases where out-of-court statements by government employees were admissible against the government).

Despite the assertion in their reply to the contrary, Respondents merely cite a list of contested documents in their motion to strike, failing to specify what about any of the documents renders them inadmissible.  Respondents assert that many of the contested documents are inadmissible because they are unauthenticated documents.  However, the news and magazine articles submitted by Petitioner (Pet'r's Exs. 17, 79) are self-authenticating under Rule 902(6) of the Federal Rules of Evidence and are therefore admissible.  Petitioner's Exhibit 31, the press release issued by Representative Christopher Shays on March 12, 2004, may also be considered self-authenticating.  Press releases by government authorities may be self-authenticating under Rule 902(5) as official publications issued by a public authority.  Although nothing on the page of the exhibit submitted by Petitioner demonstrates that it was an official document issued by

Representative Shays' office, see <u>Sannes v. Jeff Wyler Chevrolet, Inc.</u>, No. C-1-97-930, 1999 WL 33313134, at *3 n.3 (S.D. Ohio March 31, 1999) (holding that Federal Trade Commission press releases "printed from the FTC's government world wide web page[] are self-authenticating official publications under Rule 902(5)."), STN included the web address for Representative Shays' press releases in its Local Rule 56(a)(1) statement, thereby allowing the Court to verify that the press release in the record was a copy of an official document issued by a public authority. See 2 McCormick On Evid. § 227 (6th ed. 2006) (noting that information "retrieved from government websites... has been treated as self-authenticating, subject only to proof that the webpage does exist at the governmental web location.").

Respondents also move to strike numerous emails sent to and from the lobbying firm Barbour Griffith & Rogers ("BGR") for lack of authentication and as inadmissible hearsay. However, these emails have been properly authenticated to the extent that they were produced to Petitioner by BGR itself during discovery. See <u>John Paul Mitchel Sys. v. Quality King Distribs., Inc.</u>, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) (holding that the act of production itself implicitly authenticates documents). They also were identified at Loren Monroe's deposition. See Fed. R. Evid. § 901(b) (providing that "[t]estimony that a matter is what it claimed to be" is an example of identification which satisfies the authentication requirement of Rule 901(a)).

A more significant problem with the BGR emails is that they contain hearsay. Petitioner argues that the BGR emails constitute business records and are therefore admissible under the business-records hearsay exception of Rule 803(6). However, "a party seeking to introduce an email made by an employee about a business matter under the hearsay exception under Rule 803(6) must show that the employer imposed a business duty to make and maintain such a

record." Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC, Civ. No. H-06-11220,

2008 WL 1999234, at *12 (S.D. Tex. May 8, 2008); see also DirecTV, Inc. v. Murray, 308 F.

Supp. 2d 764, 772-73 (D.S.C. 2004) (admitting sales records contained in emails under the

business records hearsay exception when the sale orders were regularly received by email and the

emails were retained as records of each order). Because Petitioner has submitted absolutely no

information regarding the practice or composition of the emails at issue, the Court will not deem

them admissible as business records. New York v. Microsoft, No. CIV A. 98-1233 (CKK), 2002

WL 649951, at *2 (D.D.C. April 12, 2002).

Petitioner also argues that the emails are offered not to prove the truth of the matters

asserted within them but as circumstantial evidence of Mr. Monroe's and other writers' and

recipients' states of mind. See Fed. R. Evid. 803(3); United States v. Dupre, 462 F.3d 131, 137

(2d Cir. 2002). However, as cited by Petitioner in its briefs, the emails are offered not to reflect

anyone's state of mind but to prove that certain meetings and hearings happened and that certain

lobbying strategies were employed. To the extent that these emails constitute a record of

correspondence between Department officials, legislative staffers, members of TASK, and

employees of BGR about the opposition to STN's acknowledgment, the Court recognizes the

existence of this paper trail as a part of the admissible record. The truth of the content of the

emails written by BGR and by Congressional aides, however, are inadmissible hearsay and will

therefore not be considered. Because BGR was hired by a community organization and was not

acting in this instance as an agent of the state or federal government, communications from BGR

cannot be considered party admissions which fall within a hearsay exception. The Court will

also strike emails written by the co-founders of TASK, which is not a party to this action and

which was not acting as an agent of the state. Similarly, because no members of Congress or their aides are parties to this case, the emails written by Congressional staffers are not party admissions either. Emails written from staff members of Governor Rell's office and by employees of the Department, however, will be considered admissions of party-opponents excludable from the definition of hearsay under Rule 801(d)(2)(D) and will therefore remain in the record.

For these reasons, Respondents' Motion to Strike is granted in part. Exhibits 7, 18, 24, 28, 36, 39, 40, and 53, and portions of Exhibits 22, 38, 69, 38 to the Petitioner's motion for summary judgment will be stricken from the record.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). The moving party bears the burden of establishing that summary judgment is

appropriate.  <u>Anderson</u>, 477 U.S. at 225, 106 S. Ct. 2505.  "A defendant need not prove a

negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.

It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must

'designate specific facts showing that there is a genuine issue for trial.'"  <u>Parker v. Sony Pictures

Entm't, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (<u>quoting</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); <u>see also</u> <u>Gallo v. Prudential Residential Servs.

Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary

judgment by showing that little or no evidence may be found in support of the nonmoving party's

case.").        The same legal standards apply when considering cross-motions for summary

judgment.  A court "must evaluate each party's motion on its own merits, taking care in each

instance to draw all reasonable inferences against the party whose motion is under

consideration."  <u>Make the Road by Walking, Inc. v. Turner</u>, 378 F .3d 133, 142 (2d Cir. 2004)

(citations omitted); <u>see also</u> <u>Scholastic, Inc. v. Harris</u>, 259 F.3d 73, 81 (2d Cir. 2001).  A court

must deny both parties' motions for summary judgment if it finds the existence of disputed

material facts.  <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001).  Therefore,

"each party's motion must be examined on its own merits, and in each case all reasonable

inferences must be drawn against the party whose motion is under consideration."  <u>Id.</u> at 121.

A challenge to a final agency action such as this one is brought pursuant to the APA, 5

U.S.C. §§ 701 <u>et seq.</u>, under which judicial review is not <i>de novo review.</i>  Recognizing that

administrative agencies are more knowledgeable than the courts in many specialized areas of fact

determinations, the APA requires courts to exercise considerable deference when reviewing

agency decisions.  <u>Nat'l Res. Def. Council v. SEC</u>, 606 F.2d 1031, 1048 (D.C. Cir. 1979); <u>State

of New York Dep't of Soc. Servs. v. Shalala, 21 F.3d 485, 492 (2d Cir. 1994) (standard of review is deferential, presuming validity of agency actions as long as the decision has a "rational basis").

A court may overturn an agency decision only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E). An agency decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Vt. Pub. Research Group v. U.S. Fish & Wildlife Serv., 247 F. Supp. 2d 495, 505 (D. Vt. 2002) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)); see also Waterkeeper Alliance, Inc. v. EPA, 399 F.3d 486, 498 (2d Cir. 2005). The court looks for consideration of relevant data, a satisfactory explanation of the decision, and a rational connection between the facts the agency found and the decision it made. Miami Nation of Indians of Indiana v. Babbitt, 112 F. Supp. 2d 742, 751 (N.D. Ind. 2000), aff'd, 255 F.3d 342 (7th Cir. 2001), cert. denied, 534 U.S. 1129 (2002) (citing State Farm, 463 U.S. at 43, 103 S. Ct. 2856). "The task of the reviewing court under this standard is to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a rational connection between the facts found and the choice made." J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000) (internal questions omitted). The objective of the court's inquiry is "whether there has been a clear error of judgment." Citizens to Preserve Overton Park,

401 U.S. at 416, 91 S. Ct. 814.

B.     **Background**

*1.     Federal Acknowledgment Regulations*

The BIA has established policies and procedures for acknowledging that certain American Indian groups exist as tribes.  Federal acknowledgment of tribal existence by the DOI is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes.  25 C.F.R. § 83.2.  Acknowledgment also establishes a government-to-government relationship with the United States and entitles a tribe to the immunities and privileges available to other federally acknowledged Indian tribes.  Id.  See also Cherokee Nation v. Georgia, 30 U.S. 1, 17, 5 Pet. 1 (1831).  The acknowledgment regulations apply to "those American Indian groups indigenous to the continental United States which are not currently acknowledged as Indian tribes by the Department" and are "intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present."  Id. § 83.3.  Because a tribe is a political, not a racial, classification, Morton v. Mancari, 417 U.S. 535, 553, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974), the essential requirement for acknowledgment is continuity of tribal existence.  59 Fed. Reg. 9280, 9282 (Feb. 25, 1994).

The acknowledgment regulations contain seven criteria, each of which must be satisfied by the petitioner: (a) identification as an American Indian entity on a substantially continuous basis since 1900; (b) existence as a distinct community from historical times to the present; (c) existence of political influence or authority from historical times to the present; (d) a governing document including membership criteria; (e) membership is composed of individuals who

descend from a historical Indian tribe; (f) membership is composed of persons who are not members of an acknowledged tribe; and (g) the petitioner's prior tribal status was not terminated by Congress.  25 C.F.R. § 83.7.  A petition must be denied if the available evidence "demonstrates that it does not meet one or more of the criteria," or if there is "insufficient evidence that it meets one or more of the criteria."  Id. § 83.6(d).  Although conclusive proof is not required, the available evidence must establish "a reasonable likelihood of the validity of the facts relating to that criterion."  Id.  The burden of proof rests on the petitioner.  Id. § 83.6(c).

At issue in this case are STN's ability to satisfy the criteria established by Sections 83.7(b) and (c) of the acknowledgment regulations, showing that a tribal group has maintained community and bilateral political relations on a substantially continuous basis from historical times to the present.  Section 83.7(b) requires proof that "a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present."  25 C.F.R. § 83.7(b).  Community means "any group of people which can demonstrate that consistent interactions and significant social relationships exist within its membership and that its members are differentiated from and identified as distinct from nonmembers.  Id. § 83.1.  The regulations provide examples of how a group may demonstrate community at a particular time through a combination of "direct" evidence, such as "significant rates of marriage within the group," "significant social relationships connecting individual members," and "significant rates of informal social interaction which exist broadly among the members of the group."  Id. § 83.7(b)(1)(i)-(ix).  Alternatively, a group may demonstrate community at a particular time if it can show that more than 50% of its members reside in a geographical area exclusively or almost exclusively composed of members of the group, and the

rest of the group consistently interacts with it, or, if at least 50% of the members speak a distinct

language.  Community can also be demonstrated for a time period if at least 50% of the

marriages in the group are between members.  Id. § 83.7(b)(2)(i)-(v).

Section 83.7(c) requires proof that the petitioner has "maintained political influence or

authority over its members as an autonomous entity from historical times until the present."  25

C.F.R. § 83.7(c).  "Political influence or authority" is defined as:

> a tribal council, leadership, internal process or some other mechanism which the
> group has used as a means of influencing or controlling the behavior of its
> members in significant respects, and/or making decisions for the group which
> substantially affect its members, and/or representing the group in dealing with
> outsiders in matters of consequence.

Id. § 83.1.  Political influence or authority is a bilateral relationship between the members and

their leaders.  Miami Nation of Indians, 112 F. Supp. 2d at 756.  A group may demonstrate

political influence or authority over its members at a particular time by providing a combination

of evidence, for example, that it could mobilize significant numbers of members and resources

from its members for group purposes, that members consider actions taken by leaders to be

important, or that there is widespread knowledge and involvement in political processes by most

of the members.  25 C.F.R. § 83.7(c)(1)(i)-(iii).  Sufficient evidence for political authority at a

particular time would be if the group allocates group resources, such as land, on a consistent

basis, or settles disputes among members on a regular basis.  Id. § 83.7(c)(2)(i)-(ii).   Petitioner

must demonstrate both community and political authority on a "substantially continuous basis."

Id. § 83.6(e).

### 2.	The Proposed Finding and Final Determination of STN's Petition

The Reconsidered Final Determination issued in October 2005 that the STN was not an

Indian tribe within the meaning of federal law as provided by the federal acknowledgment regulations was the culmination of an extensive administrative process that included a Proposed Finding ("PF"), a petitioner and public comment period on the PF, a petitioner's response to the comments, and a Final Determination ("FD").  In response to requests for reconsideration filed by various interested parties, the Interior Board of Indian Appeals ("IBIA") reviewed the FD. Following the review of response briefs by STN, the IBIA vacated and remanded the FD to the Department of the Interior.  STN and other interested parties provided further comments to the agency after the remand, and in October 2005 the Department issued its final and effective agency decision, the RFD.[3]

The Proposed Finding ("PF"), or preliminary acknowledgment decision, on the STN, issued pursuant to 25 C.F.R. § 83.10(h), analyzed and evaluated all of the evidence then in the record in the context of the acknowledgment regulations.  Notice of the PF, which was issued on December 5, 2002, was published in the Federal Register, 67 Fed. Reg. 76184 (Dec. 11, 2004). (Resp'ts' Ex. C.)  The PF concluded that STN had not provided sufficient evidence that it (1) was continuously a community or (2) exercised political influence over its members throughout history.  The PF also raised a problem with regards to STN's current membership, which excluded individuals who had been ousted from or refused to be part of STN.  STN provided sufficient evidence to satisfy the other criteria.  A roughly 8-month comment period followed publication of the PF and its record, during which professional staff from the Office of Federal

---

[3]     STN submitted the RFD as Exhibit 1 to its motion for summary judgment, the FD as Exhibit 4, and the IBIA's decision In re Federal Acknowledgment of the Schaghticoke Tribal Nation, 41 IBIA 30 (May 12, 2005), as Exhibit 112.  The Intervenor-Respondents have attached the PF as Exhibit A to their cross-motion.  Citations in this Ruling will refer directly to the documents themselves.

Acknowledgment ("OFA"), provided technical assistance to the parties. (See FD at 4.) Extensive comments were received on the PF, and STN was afforded the opportunity to reply to the third-party comments.

Following an evaluation of all of the evidence in the record, the OFA professional staff determined that STN did not meet all criteria in the regulations because it did not provide sufficient evidence of community and political authority for significant periods of time. The OFA posed two questions to the Principal Deputy Assistant Secretary – Indian Affairs in a briefing paper dated January 12, 2004:

> (1) Should the petitioner be acknowledged even though evidence of political influence and authority is absent or insufficient for two substantial historical periods, and if so, on what grounds? and
>
> (2) Should the STN be acknowledged (subject to decision on Issue 1) even though a substantial and important part of its present-day social and political community are not on the current membership list because of political conflicts within the group?

(STN's Ex. 69 at 4.)

On January 29, 2004, Principal Deputy Assistant Secretary – Indian Affairs Aurene Martin, as acting Assistant Secretary, issued the Final Determination, notice of which was published in the Federal Register on February 5, 2004. 69 Fed. Reg. 5570. The FD answered both of OFA's questions in the affirmative and concluded that STN had met all seven federal acknowledgment criteria. The FD concluded that notwithstanding the insufficient evidence to establish community criterion 83.7(b) or political influence criterion 83.7(c), the continuous historic state recognition of the Schaghticoke, combined with a state-maintained reservation dating to colonial times, could be considered evidence to meet these two criteria. (FD at 14.)

Even without direct evidence in certain time periods to meet the specific criteria, the FD used state recognition as "evidence bearing on continuity of the group's existence." (Id.) The FD also concluded that since the certified membership list and the second list of unenrolled individuals reflected the "actual" political community, and since the Assistant Secretary – Indian Affairs did not have the authority to acknowledge only part of a group, the two lists should be combined to define the acknowledgeable group. (Id. at 56, 58.) In conclusion, the FD determined that STN merited federal acknowledgment.

### 3. *Political Response to the FD*

What followed the FD in the so-called backrooms of Washington is the subject of much concern to STN, one of whose central claims in this case is that the ultimate RFD was the product of undue influence exerted by state and congressional political forces. There is no dispute that the majority of Connecticut's Congressional delegation, the Governor, the Attorney General, and other anti-gaming advocates in Washington[4] fiercely opposed the FD's acknowledgment of STN. It was public knowledge that state and local interests urged the Department to reverse its acknowledgment decision. Representative Shays summed up his

---

[4] STN's petition before the DOI only concerns federal acknowledgment of the Schaghticoke tribal group as a sovereign Indian nation, and, insofar as has been presented to this Court, include no mention of casino development or other Indian gaming enterprises. However, the cultural climate of the last dozen years has created a tendency to equate tribal acknowledgment with casino development. See, e.g., Oversight Hearing on the Fed. Recognition of Indian tribes: Hearing Before the Sen. Comm. on Indian Affairs, 109th Cong., S. Hrg. 109-91 (May 11, 2005), at 10 (Representative Christopher Shays: "The bottom line for me is the recognition process is corrupt and has been for years. Regretfully, Indian recognition is too often not about recognizing true Indian tribes, but it is about Indian gaming and the license to print money.") STN notes that it first petitioned for acknowledgment in 1981, long before the gaming regulations allowed casinos to be operated on Indian lands. Common sense indicates, however, that much of the political brouhaha and community opposition to STN's acknowledgment petition stems from concerns, whether economic, social, or moral, about additional casino development in Connecticut, which is already home to two very large Indian casinos.

position in a press release issued after the FD was announced:

> It is extremely disappointing the Bureau of Indian Affairs recognized the Schaghticokes as a federal tribe. Because the state tribe only recently re-established family connections which ceased generations ago, it seemed clear they did not meet the BIA criteria of continuity from pre-colonial times. This recognition may enable the Schaghticokes to build a casino, which I believe will be very detrimental to the state. We have to respect the process, but I hope the state uses all the resources necessary to seek to overturn the decision. I will continue to work with Attorney General Dick Blumenthal to assist him in any way I can with this process.

(Pet'r's Ex. 8, Press Release, Christopher Shays, Statement on BIA Decision to Recognize Schaghticokes (Jan. 29, 2004), available at, http://www.house.gov/shays/news/2004/january/janbia.htm (last checked Aug. 19, 2008); see also Pet'r's Ex. 14, Press Release, Attorney General Blumenthal, Attorney General Asks for Moratorium on Tribal Recognitions During DC Meeting with Interior Secretary (March 17, 2004); Pet'r's Ex. 15, Press Release, Attorney General Blumenthal, Attorney General Calls for Immediate Reversal of Schaghticoke Recognition Because of BIA Error (Dec. 8, 2004); Fleming Dep. 183:12-184:1 (admitting that when it came to criticism by public officials, members of Congress, and top state political officials, "this case is – is one of the top.").) There is no question that throughout 2004 and 2005 the Connecticut Congressional delegation, Connecticut state and local officials, and other public and private stakeholders, including a community organization in the Town of Kent which hired the Washington lobbying firm Barbour Griffith & Rogers (BGR) to advocate on its behalf, lobbied the Secretary of the Interior, the BIA, the IBIA, the White House, and even this Court about reversing the acknowledgment decision.[5] (See, e.g.,

---

[5] The Federal Respondents dispute the characterization of any relevant activities as "lobbying." Although "lobbying" has acquired a negative connotation in recent years—in particular when mention in relation to Indian affairs during this period, when the government was wracked by

Letter from Ruben Barrales, Deputy Assistant to the President of the United States and Director

of Intergovernmental Affairs, to Connecticut Governor Jodie Rell (March 2, 2005); Letter from

Richard Blumenthal, Connecticut Attorney General, to Alberto Gonzales, Assistant to the

President and White House Counsel (Dec. 15, 2004); Norton Dep. 181:7-11; Letter from Reps.

Johnson, Shays, and Simmons to the Hon. Steven K. Linscheid, Chief Administrative Law

Judge, IBIA (Feb. 10, 2005); Email from Jackie Cheek to Lee Fleming, Aurene Martin, Theresa

Rosier, George Skibine, et al. (July 19, 2004); Email from Lee Fleming to George Skibine,

Aurene Martin, Jackie Cheek, Theresa Rosier, et al. (July 20, 2004); Letter from Governor Rell

to the Hon. Peter C. Dorsey, U.S. District Court for the District of Connecticut (July 11, 2005);

Letter from the Hon. Peter C. Dorsey to Governor Rell (Aug. 19, 2005).)  The open question in

this matter is whether this lobbying exerted improper pressure on agency officials and amounted

to undue political influence on the agency process.

In early March 2004, members of the Connecticut Congressional Delegation sent multiple

letters to Gale Norton, who was at that time Secretary of the Interior, expressing concern that the

FD was not based on the agency's regulations or existing precedent and urging her "to take

personal action and investigate what appears to be yet another instance of a flawed tribal

recognition process."  (Pet'r's Ex. 44, Letter from Conn. Congressional Delegation to Gale

Norton (March 16, 2004).)  On March 30, 2004, Secretary Norton had a meeting on Capitol Hill

---

scandals perpetrated by lobbyists to Indian gaming interests—-its simple definition is "to attempt to
influence or sway (as a public official) toward a desired action," Merriam-Webster Online Dictionary,
available at http://www.merriam-webster.com/dictionary/lobby (retrieved Aug. 19, 2008), which aptly
describes the undisputed interactions between various political actors and agency officials documented in
the record in this case.

with Representative Frank Wolf of Virginia[6] and Representatives Nancy Johnson, Christopher

Shays, and Rob Simmons of the Connecticut delegation.  Secretary Norton testified in her

deposition that the tenor of her first meeting with the Congressional delegation was "fairly

emotional."  (See Norton Dep. 167:9-12.)  When asked whether she agreed that Representative

Wolf and the Connecticut delegation were "pressing" her to overturn the FD, Secretary Norton

replied: "That was the outcome they wanted."  (Id. at 181:7-11.)  Representative Wolf threatened

to tell the President that Secretary Norton should be fired, apparently in response to her general

handling of the BIA (and not specifically in connection with her failure to reverse the STN

decision, as Petitioner suggests).  (Id. at 168:15-17.)  However, Norton testified at her deposition

that she does not "recall exactly what I said in response to that comment, but I did not lose any

sleep over that threat."  (Id. at 168:21-169:1.)  She also testified with respect to Representative

Wolf's threat, "I did not anticipate that anything would come of that threat even if he did follow

through and call the White House.  And in fact, nothing did come from that."  (Id. at 264:10-

265:6.)  Furthermore, when asked "what impact did your communications with the Connecticut

Congressional Delegation have in reaching the Reconsidered Final Determination on the STN,"

she responded:

> [M]uch of what they raised was irrelevant.  The questions that are appropriate are
> those that really go to whether evidence has been submitted that meets the criteria.
> They did have an effect in asking me to have the Inspector General give high
> priority to the investigation that they had requested to make sure that the process
> was being handled in a valid way.  I don't believe that their input had any effect
> on the substantive outcome of the Determination.

---

[6]     Representative Wolf was a member of the House Appropriations Committee, which
holds fiscal jurisdiction over the Department of the Interior, and a vocal opponent of Indian gaming.
(See Norton Dep. 163:13-18.)

(Id. at 261:4-22.)[7] Secretary Norton did, however, tell others in the Department, including her

senior leadership team, about the March 30th meeting and Representative Wolf's threat. (Id. at

171:4-12, 172:7-19.) On April 1, 2004, Secretary Norton had a second meeting on Capitol Hill

with Representatives Shays and Johnson, also joined by Senators Joseph Lieberman and

Christopher Dodd and Representative Rosa DeLauro. Secretary Norton was accompanied by her

congressional liaison David Bernhardt. (Norton Dep. 175:20-176:9.)

In July 2004, Representative Johnson contacted the BIA to request a meeting with agency

officials, including Principal Deputy AS-IA Martin, in order to deliver to the BIA 8,000 survey

postcards from her constituents stating that they opposed opening additional casinos in

Connecticut. In an email to staff, OFA Director Lee Fleming described the survey postcards as a

"PR ploy":

> Part of the purpose of the administrative procedures is to remove the influence of
> political pressures from the acknowledgment process. Opposition by state and
> local governments ... is not taken into account if it is not based on the criteria.
> Only evidence relating to criteria is considered in the decision. Letter-writing
> campaigns by local citizens, whether in support of or in opposition to a petition,
> do not influence the recommendations that are made to the Assistant Secretary –
> Indian Affairs.

(Pet'r's Ex. 48, Email from Lee Fleming to George Skibine, et al. (July 20, 2004).) Following

these Congressional meetings, Principal Deputy AS-IA Martin and Mr. Bernhardt were called to

---

[7]     AG Blumenthal, Senator Christopher Dodd, and others requested an Inspector General's investigation into whether any source of undue influence had affected the FD. (See, e.g., Pet'r's Ex. 25, Letter from Earl E. Devaney, Inspector General, to Senator Dodd (Aug. 27, 2004).) The Inspector General conducted an investigation but found no evidence to support the allegation that lobbyists or representatives of STN directly or indirectly influenced BIA officials to grant STN federal recognition. "Although the STN recognition decision was highly controversial, we found that OFA and the Principal Duty Assistant Secretary – Indian Affairs conducted themselves in keeping with the requirements of the administrative process, their decision-making process was made transparent by the administrative record, and those parties aggrieved by the decision have sought relief in the appropriate administrative forum – each as it should be." (Id. at 3-4.)

a meeting with three or four White House personnel, including then-Director of Domestic Policy,

Margaret Spellings, in the West Wing to discuss the STN's acknowledgment process.

(See Pet'r's Ex. 21, Shapiro Decl. ¶ 4.)  Ms. Martin believes that there were one or two

subsequent meetings attended by Mr. Bernhardt and other high officials from the Department

with White House representatives to discuss STN and the FD (id. ¶ 5), though the parties have

produced no documents or direct testimony to substantiate that those meetings occurred.

Meanwhile, STN's FD became the focus of House and Senate subcommittee hearings

attended by DOI staff, members of Congress, AG Blumenthal, and others.  See Fed. Recognition

& Acknowledgment Process by the BIA: Hearing before the House Comm. on Res., 108th Cong.,

H.R. Serial No. 108-89 (March 31, 2004) (the "March 2004 Hearing"), at 1-2, 5-14, 90-97,

101–05; Betting on Transparency: Toward Fairness & Integrity in the Interior Dep't's Tribal

Recognition Process: Hearing before the House Comm. on Gov't Reform, 108th Cong., H.R.

Serial No. 109-198 (May 5, 2004) (the "May 2004 Hearing"), at 2, 7, 21, 28, 31-33, 54-55, 59,

65-66, 97-98, 101-02, 104-06, 130, 143, 146, 176, 196; Oversight Hearing on the Fed.

Recognition of Indian Tribes: Hearing before the Sen. Comm. on Indian Affairs, 109th Cong., S.

Hrg. 109-91 (May 11, 2005) (the "May 2005 Hearing"), at 9-10, 14-15, 17, 39, 93-94, 107-09,

114-15, 119-20, 133-37, 140-41, 145-46, 149-52, 181-83, 211.  At the March 2004 Hearing

before the House Committee on Resources, Representative Johnson called on the Committee to

"invalidate the Schaghticoke decision," which she described as "flawed and illogical," and

"impose a moratorium on [all] BIA acknowledgment decisions pending a comprehensive review

of the BIA process."  March 2004 Hearing at 8, 14.  Representative Shays testified that the

agency decided to grant STN recognition "even though it seemed clear that they did not meet the

BIA criteria for proving continuity from pre-colonial times." Id. at 9. The "unfortunate reality highlighted" by the STN decision, Shays added, "is that the BIA quite clearly did not decide this case on the merits." Id. Representative Simmons testified that the "record is clear that BIA is breaking its own rules to reach their own desired outcome and that of petitioning groups and their wealthy financial backers. The recent Schaghticoke decision is a case in point." Id. at 11. OFA Director Lee Fleming was present to witness these and similar comments. Id. at 77-78.

At the May 2004 Hearing before the House Committee on Government Reform, Chairman Tom Davis acknowledged in his opening statement that the reason for the hearing was to address the concerns of the Connecticut Congressional Delegation with respect to the acknowledgments of STN and the Connecticut-based Eastern Pequots. May 2004 Hearing at 2. Connecticut Attorney General Richard Blumenthal testified that the STN FD was:

> as unprincipled as it [was] unprecedented. Never before has the BIA recognized a tribe that is admitted by the agency itself to completely lack evidence on two key required standards over decades.... And never before has the BIA so twisted and distorted State recognition to cover its deliberate disregard for absent evidence.

Id. at 28. Theresa Rosier, Counselor to the AS-IA, and Inspector General Earl E. Devaney testified at the May 2004 Hearing, and they were repeatedly asked by the Committee to defend the FD or concede that the agency had erred, culminating in a heated exchange in which Representative Simmons apologized for losing his temper. Id. at 55. Representative Wolf interjected by referring to the "corrupt [acknowledgment] process" and suggesting that the Department should be "held in disgrace" in the memory of all prior secretaries. Id. He added that the Department had made a mistake in not imposing a moratorium on all acknowledgment decisions and, if it was not fixed, "the fault would lie at the steps of Secretary Gale Norton and

this Administration." Id.  Representative Shays also questioned Theresa Rosier extensively on

the evidence necessary for a tribal group to present to demonstrate continuity.  See id. at 61.

OFA Director Lee Fleming was present for this hearing but did not testify.  Id. at 36.

On March 3, 2005, Representative Johnson introduced legislation in the House of

Representatives titled the "Schaghticoke Acknowledgment Repeal Act."  H.R. Res —, 109th

Cong. (2005) (Pet'r's Ex. 33.)  In a press release issued on March 4, 2005, Representative

Johnson, explaining why she introduced the bill, stated:

> The BIA's decision was erroneous and unlawful, and it simply cannot be allowed
> to stand .... This decision was made by ignoring evidence, manipulating federal
> regulations and overturning precedent.  The consequences of this decision,
> including a casino in Western Connecticut, would be deep and irreversible.  Local
> taxpayers would face increased financial burdens, our infrastructure would be
> overwhelmed by the round-the-clock traffic, and huge areas would be subject to
> land claims.  This bill makes sure that the people of Western Connecticut are not
> made to pay for the erroneous and unlawful decision of the BIA.

(Pet'r's Ex. 34, Press Release, Representative Nancy Johnson, Johnson Introduces Bill to Repeal

Schaghticoke Recognition (March 4, 2005), at 2-7.)

On May 11, 2005, the Senate Committee on Indian Affairs held an Oversight Hearing on

the Federal Recognition of Indian tribes.  Governor Rell, AG Blumenthal, and almost the entire

Connecticut Congressional delegation participated in the hearing, prompting BGR lobbyist to

consider it an "impressive turnout."  (Monroe Dep. 314:19-315:5.)  AG Blumenthal asked that

Congress abolish the OFA's tribal recognition authority and impose a six-month moratorium on

all recognition decisions, explaining in his written testimony that "the BIA's political leaders

have disregarded the [seven mandatory criteria], misapplied evidence, and denied state and local

governments a fair opportunity to be heard."  May 2005 Hearing at 89.  Governor Rell testified

that the "BIA is awarding Federal recognition to tribes regardless of evidence to the contrary," adding that "historical reservation lands no longer exist as such, and haven't for well more than two hundred years. They are now cities and towns, filled with family homes, churches, schools, shopping areas, and the like." Id. at 13-14. Senator Lieberman attacked the FD as an example of a "process that smacks of outright manipulation and abuse of government authority." Id. at 139. Representative Johnson testified that the OFA's "erroneous and unlawful decision to acknowledge the [STN] was made by ignoring evidence, manipulating federal regulations, and overturning precedent." Id. at 133. Representative Simmons stated, "Indeed, there is no better example of this disregard for the regulations in place than in the case of the Schaghticoke decision." Id. at 181. OFA Director Lee Fleming and Deputy Inspector General Mark Kendall also appeared at the May 2005 hearing and testified on behalf of the agency. Id. at 15.

In early 2005, Secretary Norton delegated to James Cason certain duties of the Assistant Secretary – Indian Affairs, including acknowledgment decisions. Contrary to Petitioner's representation of the evidence presented, Mr. Cason testified that at some point in 2005 he told Secretary Norton that he would be making the reconsidered final determination. He did not recall when that occurred, but the conversation was short and he told her what the outcome would be. Secretary Norton responded "okay, fine," and did not urge him to take any position in particular, nor did she inquire about the substance of the decision. She also did not tell Mr. Cason her views on the original positive determination, and he never inquired of her whether she had been involved in the positive determination because "it was not relevant." (Cason Dep. 106:16-108:13.)

### 4. The IBIA and The RFD

While the political actors worked to encourage the BIA to reverse its STN FD and/or impose a moratorium on the review of federal acknowledgment petitions, the Intervenors filed a timely request for reconsideration of the FD with the Interior Board of Indian Appeals ("IBIA"). Among other things, the Intervenors argued that: (1) the FD erroneously used the State's relationship with the Schaghticoke as a substitute for otherwise wholly absent or insufficient evidence of community and political authority; (2) the analysis of Schaghticoke marriage rates were improperly calculated and used to satisfy criteria (b) and (c) for extensive periods, contrary to the regulations and prior precedent; and (3) the FD's conclusion that criteria (b) and (c) are satisfied despite the inability of the STN to enroll a large number of significant Schaghticoke individuals was based on unlawful administrative fiat rather than probative and reliable evidence. The Intervenors and STN filed briefs addressing these issues. After briefing was concluded, OFA filed a "Supplemental Transmittal" on the marriage issue, in which it stated that the FD "is not consistent with prior [acknowledgment] precedent in calculating the rates of marriages under [25 C.F.R. §] 83.7(b)(2)()ii), provides no explanation for the inconsistency[, and] there is no evidence that the [FD] intended to deviate from precedent." (Pet'r's Ex. 73.) The OFA also stated that there was a material mathematical error that lowered the marriage rates below the threshold 50 percent for one period and that the marriage rate analysis should accordingly not be affirmed. (Id. at 3.)

In a decision dated May 12, 2005, the IBIA vacated the FD and remanded the STN petition to the BIA for further consideration. In re Fed. Acknowledgment of Schaghticoke Tribal Nation, 41 IBIA 30 (2005) (Pet'r's Ex. 112). Following its decision in In re Federal Acknowledgment of the Historical Eastern Pequot Tribe, 41 IBIA 1 (2005) ("Eastern Pequot"),

issued the same day, the IBIA concluded that the State of Connecticut's 'implicit' recognition of STN as a distinct political body "is not reliable or probative evidence for demonstrating the actual existence of community or political influence or authority within that group." 41 IBIA at 34. Rather, "the evidentiary relevance and probative value of such a [state] relationship depends on the specific nature of the relationship, the specific underlying interaction between a state and a petitioner, and how that relationship and interaction reflect in some way one or more of the elements in the definitions of 'community' or 'political influence or authority' contained in section 83.1" of the regulations. Id. at 16. To be probative, the state relationship "would need to be more than 'implicit,' and would need to be expressed in some way that reflected the actual or likely existence of those interactions and social relationships" within the petitioner's membership. Id. at 18. The IBIA concluded such a state relationship must be determined on a case- and fact-specific basis. Id. at 16. Similarly, the IBIA concluded that 'implicit' state recognition failed to meet the political criterion of 83.7(c). The essential requirement of criterion (c) is "that group leaders influence the opinions or actions of a substantial number of group members on issues regarded as significant to the group as a whole and [that] the actions of leaders are influenced by the group." Id. at 3. "We fail to see how 'implicit' state recognition of a group as a political entity constitutes probative evidence that the group actually exercises political influence or authority, and that there are actually leaders and followers in a political relationship." Id. Concluding that the use of state recognition was a substantial portion of the evidence relied upon by the Department and could affect the Department's ultimate decision, the IBIA vacated and remanded the FD to the Department. Id. at 21-23, 34; 25 C.F.R. § 83.11(d)(2).

After the matter was remanded, STN filed a motion in this Court to compel the BIA to

receive additional evidence and to provide technical assistance.  In an order dated July 23, 2005, the Court permitted the BIA to provide a technical assistance letter, the parties to submit new documents or historical evidence, and the parties to file supplemental briefs on the marriage rate issue.  (See Order on Motion to Amend Scheduling Order, Doc. No. 26, Nos. H085-1078 (PCD), 3:98-cv-1113 (PCD), 3:00-cv-0820 (PCD) (July 28, 2005).)

On October 11, 2005, Associate Deputy Secretary James E. Cason issued the RFD denying STN's petition.  Following the IBIA's directions that state recognition in and of itself could not be used as evidence of community or political authority, see RFD at 45, the RFD reevaluated the State's relationship with the Schaghticoke and determined that "it does not provide evidence for political influence or authority within the Schaghticoke, and the State did not formulate its policies towards the Schaghticoke based on the recognition of the existence of bilateral political relations within the Schaghticoke."  Id. at 58.  The RFD also analyzed the marriage rates within the Schaghticoke group during the nineteenth century, applying different methodology than had been employed in determining the FD, and concluded that marriage rates never exceeded the 50 percent threshold required to satisfy criteria (b) and (c).  Id. at 36.  The RFD therefore concluded that there was insufficient evidence to satisfy the community criterion for approximately 54 years, from 1920-1967 and from 1997-2004, using evidence either under § 83.7(b)(2), or a combination of evidence under § 83.7(b), id. at 45, and that there was insufficient evidence to demonstrate political influence or authority over its members from 1801-75, from 1885-1967, and from 1996-2004, for a total of approximately 165 years.  Id. at 58, 62. Accordingly, the RFD found that STN had failed to provide sufficient evidence to demonstrate that it was an Indian tribe entitled to acknowledgment of a government-to-government

relationship with the United States.

## C. Congressional Interference

STN first petitions this Court to invalidate the RFD on the grounds that it is the impermissible product of undue political interference by federal and state legislators and their lobbyists with the Department's decision making process. The BIA's federal acknowledgment process is an adjudicative process. Golden Hill Paugussett Tribe of Indians v. Rell, 463 F. Supp. 2d 192, 200 (D. Conn. 2006). An administrative adjudication is "invalid if based in whole or in part on [congressional] pressures." District of Columbia Fed'n of Civic Ass'ns v. Volpe, 459 F.2d 1231, 1246 (D.C. Cir.), cert. denied, 405 U.S. 1030, 92 S. Ct. 1290, 31 L. Ed. 2d 489 (1972) ("Volpe"). "Congressional interference so tainting the administrative process violates the right of a party to due process of law." ATX, Inc. v. United States Dep't of Trans., 41 F.3d 1522, 1527 (D.C. Cir. 1994) (citing Volpe, 549 F.2d at 1245-49). "A court must consider the decisionmaker's input, not the legislator's output. The test is whether 'extraneous factors intruded into the calculus of consideration' of the individual decisionmaker." Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs, 714 F.2d 163, 170 (D.C. Cir. 1983) ("Kiewit") (quoting Volpe, 459 F.2d at 1246).

Congressional interference in the administrative process is of particular concern in a quasi-judicial proceeding, and judicial review of such a process is guided by two principles. ATX, Inc., 41 F.3d at 1527. First, "the *appearance* of bias or pressure may be no less objectionable than the reality." Volpe, 459 F.2d at 1246-47 (emphasis added); see also Koniag, Inc. v. Andrus, 580 F.2d 601, 610 (D.C. Cir.), cert. denied, 439 U.S. 1052, 99 S. Ct. 733, 58 L. Ed. 2d 712 (1978) (congressional letter "compromised the appearance of the Secretary's

28

impartiality").  Second, "judicial evaluation of the pressure must focus on the *nexus* between the pressure and the actual decision maker."  ATX, Inc., 41 F.3d at 1527 (emphasis in original).  "The proper focus is not on the content of congressional communications in the abstract, but rather upon the relation between the communications and the adjudicator's decision making process."  Kiewit, 714 F.2d at 169-70.  With respect to the nexus requirement, courts have "never questioned the authority of congressional representatives to exert pressure," ATX, Inc., 41 F.3d at 1528 (citing Volpe, 459 F.2d at 1249), and "congressional actions not targeted directly at the decision makers—such as contemporaneous hearings—do not invalidate an agency decision." Id. (citing Koniag, 580 F.2d at 610).

There is no question that political actors exerted pressure on the Department over the course of 2004 and 2005 in opposition to the FD's acknowledgment of STN, both publicly through Congressional hearings and media publicity and privately through meetings and correspondence with the Secretary and other agency officials.  The issue for the Court to determine is whether the evidence presented shows that the pressure exerted can be deemed to have actually influenced the decision maker who issued the RFD.  In this case, the evidence presented does not persuade the Court that the Congressional hearings, ex parte communications between legislators and agency officials, or the publicity on the issue as a whole ultimately affected the Department's decision to issue the RFD.

Congressional hearings are not inherently improper whenever their inquiry touches on or arises from a pending administrative matter.  ATX, Inc., 41 F.3d at 1527-28.  Such hearings, even if contemporaneous with an administrative proceeding, are not unusual and do not constitute improper interference or pressure when the inquiry does not probe the decision

maker's mental process and does not specifically encourage the decision maker to make its decisions on grounds other than required by applicable law.  Id.  There have been instances where courts have found that Congressional hearings have interfered with ongoing quasi-judicial agency procedures, see, e.g., Pillsbury Co. v. Fed. Trade Comm'n, 354 F.2d 952 (5th Cir. 1996), and courts should not "shrug off a procedural due process claim merely because the officials involved should be able to discount what is said and to disregard the force of the intrusion into the adjudicatory process."  Id. at 964.  However, in Pillsbury, the leading case on this issue, Senators at the Congressional hearing point-blank asked the Federal Trade Commissioner, the actual decision maker in the pending agency process, why he had made specific decisions in regards to the petition under review, to the point that he felt compelled to recuse himself from the commission proceedings following the Senate hearings.  Id. at 952-54.  Where Congressional hearings do not call the actual decision maker to testify on a pending decision, however, the hearing does not amount to improper influence which warrants invalidating the subsequent agency decision.  For example, in Koniag, Inc., Village of Uyak v. Andrus, 580 F.2d 601 (1978), the petitioners moved to invalidate DOI decisions finding certain native Alaskan villages ineligible to take land and revenues under the Alaska Native Claims Settlement Act when congressmen expressed disagreement with prior eligibility determinations at a Congressional hearing contemporaneous to the agency's review of petitioners' claims.  The D.C. Circuit Court of Appeals held that Pillsbury was not controlling because none of the witnesses called before the Subcommittee was a decision maker in the petitioners' cases.  Id. at 610.  Even if Pillsbury extended to the advisers of the decision maker who were present at the hearing, those advisors weren't called on at the hearing to prejudge any of the pending claims.  Id. (citing Pillsbury, 354

F.2d at 964).

The Congressional hearings in this case reviewing the BIA's acknowledgment processes do not amount to undue interference with the Department's RFD of STN's status. There is no question that, as discussed above, various members of Congress as well as the Connecticut Governor and AG expressed their disapproval with the STN acknowledgment at the Congressional hearings on the subject, and the hearings became heated on at least one occasion. However, nothing in the record shows that these hearings had any impact on Associate Deputy Secretary Cason, the decision maker for the RFD. The Secretary's legislative liaison David Bernhardt testified that he was generally aware of the hearings but did not discuss them with Cason. (Bernhardt Dep. 121.) Secretary Norton could not even recall anything about the hearings at her deposition (Norton Dep. 187, 190-91, 212), and Cason could not recall knowing about the hearings or being told anything about them. (Cason Dep. 47-49.) OFA Director Lee Fleming was present at the hearings, but he testified at his deposition that he was not intimidated or influenced by any of the congresspersons or the Attorney General. (Fleming Dep. 170-72.) The fact that Representative Johnson introduced legislation to specifically reverse the Department's acknowledgment of STN also does not constitute undue influence that should invalidate the RFD because legislation does not solely address agency decision makers. ATX, Inc. 41 F.3d at 1528 (citing Koniag, 580 F.2d at 510). Moreover, Norton, Cason, and Bernhardt all testified that they had no recollection of the Johnson bill, which tends to suggest that it did not seriously impact their decision making. (See Norton Dep. 245; Cason Dep. 40-41; Bernhardt Dep. 119-20.)

Similarly, nothing in the record convinces the Court that the legislators' ex parte

communications, either through written correspondence, public announcements, or at meetings with Department officials, actually influenced the decision making process resulting in the RFD. Although the Capitol Hill meetings were admittedly heated and unquestionably arranged so as to lobby Secretary Norton to revise the acknowledgment determination, the record does not show a nexus between them and the agency's ultimate decision to revise the STN acknowledgment decision. Both Cason and Fleming testified that no one talked to them about the particularly contentious meeting at which Representative Wolf threatened Secretary Norton (see Cason Dep. 53-54; Fleming Dep. 65-67), and Secretary Norton testified that she did not take the threats seriously. (Norton Dep. 168-9, 275-76.) The Department officials deposed in this case uniformly testified that none of these communications, or any other Congressional activity, had any impact on the decision making process that culminated in the RFD. (See Norton Dep. 112, 183, 161; Cason Dep. 91-92; Fleming Dep. 168-75, 190-93.) There is no evidence that Mr. Cason even had any direct contact with the Connecticut Congressional delegation, the White House, any state officials, or any lobbyist concerning STN. At his deposition, Cason testified that he did not receive, directly or indirectly, any communication from the Connecticut Congressional delegation, any state officials, or BGR, and he did not consider any factors or criteria that were not discussed in the RFD. (Cason Dep. 50-51, 65-66, 75-76, 82, 130.) See Kiewit, 714 F.2d 170 (decision maker not "tainted" by Congressional power where no evidence that the ultimate decision maker was aware of a Senator's letters to Department of Defense, no evidence the Senator contacted him directly, and no evidence that the Department officials who had spoken to the Senator then contacted the decision maker.). Although one may be sympathetic to STN's suspicions that powerful political forces interfered with an independent

review of their tribal recognition, the Court must accept the evidence as presented at face value, in particular the testimony by the agency decisionmakers that they were not unduly pressured by particular politicians or the political climate at large.

In sum, the evidence presented by STN does not show that the legislative activity *actually* affected the outcome on the merits by the BIA. See ATX, Inc., 41 F.2d at 1529; Kiewit, 714 F.2d at 169; Volpe, 459 F.2d at 1246. Nothing suggests that the actual decision maker was impacted by the political pressure exerted by state and federal legislators or their surrogates. Neither the IBIA decision nor the RFD mentioned the testimony of the congresspersons, the congressional letters, or the proposed legislation, see ATX, Inc., 41 F.3d at 1529, and the Secretary and other deposed Department officials testified that the Congressional delegation had no impact on their work or ultimate decisions. Granted, it may be the case that Congressional pressure compromises an administrative proceeding even where the record would allow the decision maker to reach the same conclusion independently. ATX, Inc., 41 F.3d at 1530. An administrative decision must be based "strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes." Volpe, 459 F.2d at 1246. Here, however, the nexus between the pressure exerted and the actual decision makers is tenuous at best, and the evidence adequately establishes STN's ineligibility for tribal recognition. See ATX, Inc., 41 F.3d at 1530. Accordingly, the Court concludes that political influence did not enter the decision maker's "calculus of consideration." In the absence of such interference, there is no clear violation of STN's due process rights to justify this Court's extraordinary interruption of the administrative process. See Kiewit, 714 F.2d at 170.

### C.      Arbitrary & Capricious

Petitioner STN next argues that the RFD must be invalidated because it is arbitrary and capricious. STN contends that the Department's RFD was arbitrary and capricious because the Department's state recognition analysis in the RFD failed to adhere to the IBIA's decision and inadequately explained its reasoning. STN also contends the RFD was arbitrary and capricious because STN has in fact satisfied the marriage rate criterion of § 83.7(c) and the methodology employed by the Department in the RFD to determine STN marriage rates was unreasonable, arbitrary, and capricious. STN has a heavy burden of proof in establishing that the Department's RFD cannot withstand judicial review. An agency's interpretation of its own regulations is entitled to deference, Chevron v. Nat'l Res. Def. Council, 467 U.S. 837, 844-45, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997); Masayesva v. Zah, 792 F. Supp. 1178, 1187 (D. Ariz. 1992) (same in the context of a BIA regulation), as is the weight given to the evidence by the agency. Miami Nation of Indians, 55 F. Supp. 2d at 925. Because evidence of both community and political influence or authority throughout history are mandatory criteria under the federal acknowledgment regulations, this Court will only remand the petition to the agency if it finds that the decision on each of the criteria was arbitrary and capricious under the APA. As long as the evaluation of the evidence under 83.7(b) and (c) in the RFD is reasonable based on the agency's interpretation of the regulations, the RFD should be affirmed.

### 1.    State Recognition

In remanding the state recognition issue to the Department, the IBIA instructed the Department to "articulate specifically how the State's actions toward the [petitioner] during the relevant time period(s) reflected or indicated the likelihood of community and political influence

or authority within" STN, as those concepts are defined in 25 C.F.R. § 83.1. 41 IBIA at 21. STN also contends that it was incumbent upon the Department to explain the constitutional federalism principles which Secretary Norton had considered in evaluating the weight to place on implicit state recognition, although nothing in the regulations themselves or the IBIA decision mandates the Department to do so. STN now argues that instead of attempting to support its prior decision under the new IBIA standards, it reached a "completely different decision that had nothing to do with the IBIA's new standards or the policy considerations that the Department had originally relied on." (Pet'r's Mem. in Supp. of Mot. for Summ. J. at 68.) This is a gross overstatement which misinterprets the IBIA's ruling and misrepresents the RFD, which presented a reasonable and cogent analysis of the state recognition issue as instructed by the IBIA.

An agency is entitled to reverse course on a decision, so long as it provides a reasoned analysis for doing so. State Farm, 463 U.S. at 56, 103 S. Ct. 2856. Having reviewed the RFD, the Court concludes that the Department came to a researched and well-reasoned conclusion regarding the state recognition issue. STN contends that the Department's reconsidered state recognition analysis was "truncated, conclusory, [and] nonsensical." (Pet'r's Mem. at 76.) This representation of the analysis in the RFD is baseless. The RFD devotes 13 pages to an analysis of the IBIA's state recognition instructions and a reevaluation of the evidence presented proving the elements of state recognition. See RFD at 45-58. STN also argues that the absence of other evidence in the record to shed light on the Department's new conclusions regarding the state recognition issues renders it unreasonable. However, the RFD stands on its own, without any explanation by supplementary notes, memoranda, email, or other documents to provide insight into the Department's analytic process.

STN argues that the RFD fails to explain why the Department no longer believed that the state recognition evidence contained in the record was entitled to any weight with respect to criteria (b) and (c) when in the FD it had considered that same evidence to be strong and probative. However, contrary to STN's interpretation of the IBIA decision, the IBIA did not merely require the BIA to provide a better explanation for the weight it had accorded state recognition. Rather, the IBIA clearly concluded that the FD's use of the State's 'implicit' recognition of the STN as a 'distinct political body' was not reliable or probative evidence for demonstrating the actual existence of community or political influence or authority required for federal tribal acknowledgment. 41 IBIA at 34. Although it is correct that the IBIA did not conclusively prohibit the use of evidence relating to a state's relationship, it definitively concluded that the FD had used state recognition that was inconsistent with the acknowledgment regulations. Id. The IBIA instructed the BIA that if state recognition was to be used as evidence, the BIA needed to identify aspects of the State's relationship with the Schaghticoke that in fact demonstrated that the Schaghticoke had existed as a community and had exercised political authority; the mere existence of a relationship between the State and the group or its members could not alone fill in the large historical gaps in the evidence of community or political authority. See 41 IBIA at 16 ("In order for the State's relationship to be probative of the first part of the definition of 'community,' it would need to be more than 'implicit,' and it would need to be expressed in some way that reflected the actual or likely existence of those interactions and social relationships."); id. at 18 ("Once again, we fail to see how 'implicit' state recognition of a group as a political entity constitutes probative evidence that the group actually exercises political influence or authority.... Rather, there needs to be more than 'implicit' recognition, and

the relationship between the State and the group needs to be expressed in some way that reflects the existence or likely existence—not simply theoretical or presumed—of political influence or authority within the group[.]").  The IBIA then specifically evaluated the four elements of the State's relationship that had been relied on by the BIA to support its use of state recognition as evidence and found them all lacking probative value.  Id. at 16, 20-21, 34.

Following the instructions of the IBIA, the RFD also reexamined the State's relationship with the Schaghticoke, concluding, as it had in the FD, that the State's relationship was not explicitly or implicitly based on a recognition of a government-to-government relationship with the Schaghticoke or on the existence of bilateral political relations within the group.  RFD at 48; see also FD at 14.  The RFD then proceeded to reevaluate the underlying elements of the State's relationship which had previously been used to support the use of state recognition: the purported noncitizenship status of Indians in Connecticut, see RFD at 49; the overseer system which had oversight responsibilities as to Connecticut Indians, see id. at 50; the continuous existence of a Schaghticoke reservation, see id. at 50, 53-58; and the rationale for the State's historical relationship with the Schaghticoke.  Id. at 51.  It is not necessary for the Court to reiterate the evidence presented regarding each of these elements or the RFD's analysis of such evidence.  Suffice it to say that in considering each of the elements, the RFD presents a thorough, rational, and well-reasoned evaluation, leading to the conclusion that they do not add up to demonstrate the actual existence of a political community throughout most of the history of the Schaghticoke.  The record supports the DOI's conclusion on remand that the State's relationship, as understood through an examination of each of the underlying elements and supporting record evidence, does not provide the missing evidence of community and political authority that STN lacks to meet the

acknowledgment criteria.

STN devotes extensive space in its briefs to emails between OFA staffers who drew different conclusions about the state recognition, as well as to the FD's analysis of the State recognition issue. However, the fact that reasonable minds within an agency may differ in opinion on a given issue does not render the final analysis of the RFD any less rational or defensible. Similarly, the fact that the FD was well-reasoned is beside the point when the IBIA specifically overruled its state recognition analysis and instructed the BIA to take a second look at the available evidence. STN also argues that the Department's change in position between the FD and the RFD "must have" been caused by political pressure, but there is no evidence in the record suggesting a direct link between the lobbying of certain Department officials and the reevaluation of the state recognition issue in the RFD. On the contrary, the RFD's reasoned explanation of the state recognition reevaluation, premised on an accurate reading of the IBIA's instructions on remand, and without any other evidence suggesting improper influence on this particular issue, withstands judicial scrutiny.

### 2. *Marriage Rates*

STN also claims that the RFD is arbitrary and capricious because its analysis of marriage rates was contrary to the acknowledgment regulations, methodologically flawed, and lacking a reasonable explanation for its decision. A petitioner satisfies the community criterion of 25 C.F.R. § 83.7(c) for any period in which it has demonstrated that "[a]t least 50 percent of the marriages in the group are between members of the group." 25 C.F.R. §§ 83.7(b)(2)(ii) and (c)(3). STN had submitted evidence and analysis of its marriage rates throughout the 19th century. OFA evaluated this evidence and concluded in the FD that STN had demonstrated

sufficient marriage rates to receive the benefit of the "carryover" provision under § 83.7(b)(2)[8] to meet its burden of proof to demonstrate political influence or authority under § 83.7(c)(3) for the periods from 1800 to 1820 and from 1840 to 1870.

The parties dispute the proper methodology for calculating marriage rates for purposes of the acknowledgment requirements. STN presented a particular analysis which the OFA adopted and included in the FD. In their motion for reconsideration, the State Intervenors argued that STN's marriage rate analysis overvalued the number of in-group marriages by counting individual STN members, rather than the marriages between two STN members. In December 2004, after STN submitted its reply to the State's reconsideration request to the IBIA, the Solicitor's Office of the DOI filed a Supplemental Transmittal which expressed concern that the OFA may have used an incorrect methodology in calculating in-group marriage rates and informed the IBIA that it could not affirm the FD "absent explanation or new evidence." (Pet'r's Ex. 73 at 203.) On reconsideration, the IBIA did not consider whether the OFA had in fact used the correct marriage rate methodology in the FD. Instead, it remanded the issue back to the Department:

> Because we are already vacating and remanding the FD to the Assistant Secretary for reconsideration based on Historical Eastern Pequot Tribe, and because OFA has acknowledged problems with the FD's endogamy rate calculations—at a minimum, inadequate explanation—we conclude that this matter is best left to the Assistant Secretary on reconsideration.

41 IBIA at 34.

---

[8]      Section 83.7(c)(3) links the community criterion in section (b) with the political authority criterion in section (c) by providing that a petitioner which has met § 83.7(b)(2) for a particular time period is deemed to have provided sufficient evidence to "carryover" and thereby satisfy criterion (c) for that time period as well.

The RFD devotes 30 pages to the marriage rate analysis, see RFD at 6-36, and explains that the purpose of calculating marriage rates within the group under § 83.7(b)(2) concerns the "social links" within the group established by marriages. "The ratio of links [marriages] within a group versus those outside the group provides a valid measure of the level of social cohesion within the community." RFD at 8. Accordingly, the RFD's reevaluation of the marriage rate issue employed a methodology focusing on the number of marriages between members of the STN group, rather than on the number of individual STN members who had chosen to get married either to other tribal members or to persons outside the group. The analysis in the RFD is premised on a reasonable interpretation of the regulation, to which this Court defers, Auer v. Robbins, 519 U.S. at 461, 117 S. Ct. 905 (an agency's interpretation of its regulation is "controlling unless plainly erroneous or inconsistent with the regulation") (internal citations omitted), and the agency's precedent in counting marriages under the acknowledgment regulations. Whereas the language in other subsections of § 83.7(b)(2) refer to 50 percent "of the *members*" or "of the group's *members*," the subsection at issue here discusses whether "50 percent of the *marriages*" are between members of the group. Compare §§ 83.7(b)(2)(i) and (b)(2)(iii) with (b)(2)(ii). Furthermore, the RFD cites as agency precedent a proposed finding for another petitioning tribal group which counted marriages, not individuals who got married, and specifically rejected the methodology that STN seeks: "The acknowledgment regulations plainly refer to the percent of *marriages,* not the percent of *members* of the group affected. Thus, the percent of *members* participating in in-group marriages is not relevant evidence for the 50 percent requirement of the regulations." RFD at 10 (emphasis in original). (See also

Intervenors' Ex. D, Little Shell Proposed Finding at 178-79.)[9]  The RFD thoroughly engaged

STN's proposed methodology and accompanying arguments but ultimately concluded that the

"use of the term 'marriages' rather than 'individuals involved in marriages' within a group

reflects the intent of the regulations to measure social links."  RFD at 14.  Deferring to the

agency's choice of methodology and weight afforded the evidence before it, the Court concludes

that the RFD's marriage rate analysis and accordant findings are reasonably explained and are not

arbitrary or capricious.

STN insists that the RFD erred in relying on this interpretation and this methodology and

advocates the use of a different endogamy methodology.  The Court declines to engage in an

academic debate about which endogamy methodology is most appropriate to employ in this

instance.  Even this Court's description of the marriage rate methodology issue is admittedly

rudimentary, precisely because such anthropological debates are outside the purview of this

Court's expertise.  The Court is confident based on a review of the record that the professionals

in the agency have engaged with the academic debates on this issue and made an informed,

reasoned decision to make the marriage rate analysis it ultimately did in the RFD.  The Court

does note, however, that the methodology proposed by STN seems ill-suited to the regulations at

---

[9]      STN disputes that agency precedent employed the RFD's marriage rate analysis
methodology, citing staff members' recollections, one in a hand-written note and one attested to in a
declaration, that other acknowledgment decisions had used STN's proposed methodology.  However,
Respondents point to precedent from those acknowledgment decisions and show that they used the
RFD's methodology, contrary to the recollections of individual staffers.  (See, e.g. Intervenors' Ex. E, the
Jena Band of Choctaw Indians Proposed Finding.)  STN also submits evidence by staffers and other
academics who recommend the STN's proposed methodology.  However, the existence of an academic
debate on the merits of different methodologies used in the marriage rate analysis does not undermine the
Court's conclusion that in this instance the RFD made a principled, informed decision, based both on
expertise and on agency precedent, to employ the particular methodology it did.

hand. STN argues that any methodology for calculating marriage rates under § 83.7(b)(2)(ii) must exclude from consideration any marriage that are not marriages in the group, meaning marriages to outsiders are excluded from the calculation. (Pet'r's Mem. in Support of Mot. for Summ. J. at 87; see also id. at 88.) Ignoring marriages of group members to persons outside the group would always lead to marriage rates of 100%, a result which even a layperson would conclude is absurd and does not measure social cohesion as the regulations intend.

STN argues that the OFA's changed course on the marriage rate analysis must have been the result of the improper political pressure "with little to no input from the OFA professional staff" (Pet'r's Mem. at 87, 95), but the record instead shows that the RFD is the result of the OFA's deliberate, months-long investigation into the marriage rate analysis in the FD and the need to correct it on remand. The record demonstrates that OFA questioned the marriage rate calculation on reading the Intervenors' request for reconsideration before the IBIA, held a meeting on July 14, 2004 questioning the interpretation in the FD, and set a meeting agenda in August 2004 to discuss the issue further. (See Admin. Record AC-VO15-D0005, BR-V013-D0050; Pet'r's Ex. 102.) These meetings culminated in a briefing paper prepared by OFA, dated November 16, 2004, which points out the inconsistency in the STN FD from acknowledgment precedent and provides options on how to proceed. (Fed. Resp'ts' Ex. H, "Briefing Paper on Schaghticoke Reconsideration Request," at 2.) In the briefing paper, OFA recommended that it file a transmittal before the IBIA to insure that the errors can be corrected and the IBIA was advised of the precedent. (Id.) OFA also noted the difficulty in remaining silent while the IBIA reviewed the case over the course of the year, raising "questions concerning how to evaluate acknowledgment cases" and "what technical advice to provide petitioners" in the interim. (Id.)

This evidence all suggests the professional staff in the agency was doing its job reasonably and responsibly. (See also Norton Dep. 53, 58 (testifying that if a mistake was made, it needed to be corrected); Bernhardt Dep. 102-3 ("in order to maintain the integrity of the administrative process," the OFA should inform the IBIA of any error.).)

The Court also recognizes that the marriage rate analysis in the FD and the RFD impacts only 50 years of political influence criterion (c) but does not impact the deficiencies in evidence concerning political influence for the other 115 years for which the RFD found that STN failed to meet § 83.7(c). Thus, even if the RFD's marriage rate analysis was arbitrary and capricious, STN would still fail to meet political criterion (c) because of the other significant time periods for which it failed to provide evidence demonstrating political influence or authority.

### 3. Community and Political Authority between 1996 and 2004

STN also claims the RFD was arbitrary and capricious because it abandoned precedent and failed to explain its new reasoning when it determined that the STN had failed to satisfy criteria (b) and (c) for the period after 1996 on the basis that a significant number of Schaghticoke individuals refused to consent to STN membership. These individuals comprise two groups, the Schaghticoke Indian Tribe ("SIT") and members of the Coggswell family, who oppose the current leadership and federal recognition of STN. The SIT has submitted its own petition for federal acknowledgment, claiming that it, and not STN, is the true representative of the Schaghticoke tribal group. See 41 IBIA at 38. The Coggswell family agrees that the Schaghticoke satisfy the criteria for federal acknowledgment but does not recognize STN's current leadership as legitimate.

The PF determined that, for the period after 1996, STN satisfied neither criterion (b) or

(c) because the STN's membership excluded a large number of individuals representing important family lines or sublines from the group's history, including members of the SIT group and members of the Coggswell family.  (See Intervenors' Ex. A, PF at 20, 30, 212-13.) Following the PF, STN attempted to obtain the membership of several of these other individuals, though some of those individuals did not consent to membership.  Accordingly, the FD concluded that key Schaghticoke individuals, such as former council leadership, in the community and political system as it existed before 1996 were not on the membership list, even though they were part of the STN community.  Concluding that STN could not be recognized without the unenrolled members constituting part of the tribe, the FD allowed the unenrolled members to be considered part of the membership, despite STN's repeated failed efforts to enroll them.  FD at 56-57.   The Intervenors and members of SIT and the Coggswell family raised the FD's treatment of the post-1996 membership on its motion for reconsideration before the IBIA, which concluded that the issue was outside its jurisdiction and referred it back to the Department for reconsideration.  43 IBIA at 40, 42.

On remand, the RFD reconsidered the FD's conclusion that STN satisfied criteria (b) and (c) for the period after 1996 because the unenrolled individuals could be deemed STN members until they affirmatively declined such status.  The RFD considered evidence that, following the issuance of the FD, 33 of the 42 'unenrolled' members refused to consent to membership with STN.  RFD at 61.  Relying on Masayesva v. Zah, 792 F. Supp. 1178 (D. Ariz. 1992), the RFD concluded that "a necessary condition to membership [is] the existence of a bilateral political membership, which required consent on the part of both" the tribal group and the unaffiliated members.  Id.  Therefore, because 33 of the unenrolled individuals do not consent to be part of

the STN, they are not considered members of STN for purposes of the federal acknowledgment regulations.  Id.  See also 25 C.F.R. § 83.1 (defining member of an Indian group as "an individual who is recognized by an Indian group as meeting its membership criteria *and who consents to being listed as a member of that group.")* (emphasis added).  Focusing on the evidence presented that these members refused to consent to membership, the RFD made a reasonable decision that the STN's membership for the period following 1996 did not satisfy criteria (b) and (c) "because as defined by its membership list, it does not constitute the entire community and political system."  RFD at 62.

STN argues that the RFD's conclusion that these individuals were not part of STN lacked reasonable explanation, departed from precedent, and constituted a "last-minute reversal" which must have been the result of undue political interference.  However, the PF had drawn a similar conclusion that STN failed to meet the community and political criteria in part because of the significance of the omission of these individuals from the membership.  In a technical assistance letter to STN, the OFA advised that "it is very important that the STN membership substantially include these individuals and families," and "as it now stands the group is not the same group that was active from the 1960s to 1996."  (Pet'r's Ex. 105 at 2-3.)  STN claims that the agency told it that the group would meet its membership requirements if it amended its constitution to include the unenrolled members.  However, the record clearly demonstrates that the agency's emphasis was not just on amending the STN constitution but on actually enrolling the important unaffiliated members and that STN understood the importance of including more historically significant members on its membership roll.  (See Admin. Record SN V-063-D00006, SN-V063-D0011, OD-V001-D0010.)  The RFD's decision is therefore reasonable based on the evidence

before it and not so unfounded or suspiciously 'last-minute' to be arbitrary or capricious.

### D. ADS Cason's Authority to Issue the RFD

Finally, STN claims that the RFD must be invalidated because it was made by an unauthorized official. STN contends that James Cason holds his full-time position as Associate Deputy Secretary ("ADS") and his delegation as Assistant Secretary – Indian Affairs ("AS-IA") in violation of mandatory constitutional and statutory provisions; therefore, lacking authority to act as he did, his decision must be null and void by operation of law. First, STN argues that Mr. Cason's position requires Presidential nomination and Senate confirmation pursuant to the Appointments Clause of the Constitution.[10] However, the position of Associate Deputy Secretary is not a "principal" officer of the United States who must be appointed by the President and confirmed by the Senate. The Comptroller General reviewed Mr. Cason's appointment in 2002 and determined that in his role as ADS he was "properly appointed to his position as a Non-Career Senior Executive Service federal employee." <u>See</u> Comptroller General of the United States Opinion B-290233, 2002 U.S. Comp. Gen. LEXIS 265, at *2 (Oct. 22, 2002). As such, he is not a "principal" officer such as an agency head who must be nominated by the President and confirmed by the Senate. <u>See</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 125, 96 S. Ct. 612, 46 L. Ed. 2d 659

---

[10] The Appointments Clause states that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint .... all other officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., Art. II § 2, cl. 2.

(1976); Edmond v. United States, 520 U.S. 651, 663, 117 S. Ct. 1573, 137 L. Ed. 2d 917 (1997);

Opinion B-290233 at *11 (notwithstanding Cason's high degree of expertise and skill," the

Associate Deputy Secretary is one of the lesser functionaries").

  At best, Cason is an inferior officer, not a principal officer, because he is always subject

to the supervision and authority of the Deputy Secretary and Secretary, who are both

Presidentially appointed and Senate confirmed.  The fact that the ADS serves at the pleasure of

the Secretary and can be removed by him at any time is indicative of his subordinate role to the

Secretary.  See Edmond, 520 U.S.  at 663, 117 S. Ct. 1573 ("The power to remove officers ... is a

powerful tool for control" and a significant factor in the principal versus inferior officer

analysis.); see also Morrison v. Olson, 487 U.S. 654, 671, 108 S. Ct. 2597, 101 L. Ed. 2d 569

(1988) ("First, appellant is subject to removal by a higher Executive Branch officer"); Silver v.

United States Postal Serv., 951 F.2d 1033, 1038-39 (9th Cir. 1991) ("The significance of

appointment and removal power is well established in Appointments Clause jurisprudence.").

Thus, while Mr. Cason has responsibility for important duties in the Department, "the fact that

[]he can be removed by the [Secretary]... indicates that []he is to some degree 'inferior' in rank

and authority."  Morrison, 487 U.S. at 671, 108 S. Ct. 2597.  As an inferior officer, Mr. Cason

need not be appointed by the President and confirmed by the Senate, see Buckley, 424 U.S. at

132, 96 S. Ct. 612, and STN's Appointments Clause argument therefore has no merit.

  STN also argues that Mr. Cason's performance of the duties of the AS-IA constitutes a

separate statutory violation.  The Vacancies Reform Act ("VRA"), 5 U.S.C. §§ 3345 et seq.,

governs how a vacancy in a position held by an official appointed by the President with the

advice and consent of the Senate ("PAS") may be filled on an 'acting' basis.  See id. § 3345.  The

VRA requires that the employee who holds the position of 'first assistant' to the absent PAS shall automatically perform the functions and duties of the PAS position, unless the President designates another person to temporarily perform the functions or duties of the PAS.  The Department's orders of succession for the AS-IA establishes that the PD-ASIA is the first assistant to the AS-IA, who would, upon a vacancy, succeed to the office on an acting basis pursuant to 5 U.S.C. §§ 3345(a)(1).  In early 2005, when the AS-IA resigned, the PD-ASIA position was vacant.  Because no one was appropriately situated to become acting AS-IA, the Secretary delegated the non-exclusive functions and duties of the AS-IA position to the ADS, James Cason.  STN contends that Cason was not statutorily authorized to act in the capacity of the AS-IA and therefore could not have properly issued the RFD.

In the case of a PAS vacancy not filled with an 'acting' official, the Act requires that the position remain vacant and that only the agency head may perform the "functions and duties" of the position.  5 U.S.C. § 3348(b).  To ease the burdens on the agency head, however, Congress limited the "functions and duties" that must be performed by the agency head to those that are required by statute or regulation to be performed exclusively by the official occupying that position.  5 U.S.C. § 3348(a)(2).  Accordingly, any functions or duties not required by statute or regulation to be performed by the official occupying that position may be reassigned to another official within the agency or department.

In February 2005, Secretary Norton issued an order delegating the authority delegated to the AS-IA to the ADS, "except for those functions or duties that are required by statute or regulation to be performed only by the [AS-IA]."  (Secretarial Order 3259, Fed. Resp'ts' Ex. 6.) The Order provided that the duties required by statute or regulation to be performed only by the

AS-IA will be performed by the Secretary herself, in accordance with the VRA. (Id.)[11] The question before the Court is whether the authority to make tribal acknowledgment decisions is required by statute or regulation to be performed only or exclusively by the AS-IA.

The requirement to make acknowledgment decisions is not assigned by statute exclusively to the AS-IA. Acknowledgment decisions are governed by 25 U.S.C. Part 83, which cites as statutory authority the Secretary of Interior's general authority found at 5 U.S.C. § 301, 25 U.S.C. §§ 2 and 9, and 43 U.S.C. § 1457. These statutory sections do not even mention acknowledgment decisions, let alone assign the function "only" or "exclusively" to the AS-IA.

It is less clear whether the regulations limit acknowledgment determinations "exclusively" to the AS-IA, but the Court is ultimately not convinced that the delegation of such responsibilities to Mr. Cason was unlawful. Under the regulations, the AS-IA has responsibility for making acknowledgment determinations on behalf of the Secretary. See 25 U.S.C. Part 83. The regulation does not assign that responsibilities "exclusively," "only," or "solely" to the AS-IA, though it does use the term "shall," arguably suggesting a mandatory instruction limited to the AS-IA. Id. § 83.1. However, the regulation contemplates that the AS-IA's responsibilities may be delegated to other agency officials: it defines the term Assistant Secretary to include the AS-IA "or that officer's authorized representative." Id. Furthermore, prior to the Secretary's delegation of duties to the ADS, the Department prepared a memorandum reviewing the functions and duties of the AS-IA to determine whether any such duties are required to be performed only by the AS-IA. (See Fed. Resp'ts' Ex. 5.) This memorandum identified three

___

[11]     The Order also provided that it would automatically expire upon either the confirmation of a new AS-IA or upon the delegation of an Acting AS-IA in accordance with the VRA. (Id.)

statutory sections assigning functions or duties exclusively to the AS-IA, but it found no

regulations at all, and certainly none relating to acknowledgment decisions, which did so. (Id.)

With this evidence before it, and without any case law stating the contrary, the Court accepts the

Respondents' position that acknowledgment determinations are not a function or duty assigned

by statute or regulation only to the AS-IA for purposes of the VRA, 5 U.S.C. § 3348.

STN does not extensively argue any differently; rather, it focuses its VRA argument on

the contention that authority should have automatically been assigned to the First Assistant AS-

IA, thereby rendering Cason's exercise of the AS-IA responsibilities unlawful. However,

contrary to STN's representation of the situation, Cason did not assume the position of Acting

AS-IA. Instead, the Secretary reassigned certain non-exclusive responsibilities of the AS-IA to

him for a finite period of time, a course of action permissible within the VRA's statutory scheme.

See S. Rep. 105-250 at 18-19; Guidance on Application of the Fed. Vacancies Reform Act of

1998, Dep't of Justice, Office of Legal Counsel (March 22, 1999), Question 48 ("the Act permits

non-exclusive responsibilities to be delegated to other appropriate officers and employees in the

agency."). STN also attempts to show that Michael Olsen, who was Counselor to the AS-IA, was

actually the PD-ASIA, the first assistant to the AS-IA who should have succeeded to the office of

AS-IA upon a vacancy in accordance with 5 U.S.C. § 3345(a)(1). However, the evidence

presented shows that Mr. Olsen was not appointed to the position PD-ASIA until June 2006, long

after Cason, exercising the authority delegated to him by the Secretary in the absence of an AS-

IA or an Acting AS-IA, issued the RFD.

STN also argues that Mr. Cason's fulfillment of the AS-IA responsibilities were unlawful

because his service continued beyond the time limits of the VRA. These arguments are also

meritless.  The time limitations in Section 3346 of the VRA apply only to a person serving in an

acting capacity under Section 3345.  The VRA sets no time limits, however, on redelegations of

nonexclusive duties.  Therefore, the only time limitations relevant in this case are those set by the

Secretary in her order delegating certain responsibilities to Mr. Cason, which extended beyond

the date on which Cason issued the RFD.[12]  For these reasons, STN has failed to show that Cason

was impermissibly exercising his authority when issuing the RFD and that it must be invalidated

as an ultra vires decision.[13]

## IV.    CONCLUSION

For the reasons stated above, STN has failed to meet its burden of showing that the RFD

was the product of undue political interference, arbitrary and capricious, or outside the limits of

the Appointments Clause or the Vacancies Reform Act.  Accordingly, STN's Motion for

Summary Judgment [Doc. No. 165] is **denied.**  Respondents' Cross-Motion for Summary

Judgment [Doc. No. 178] and the Intervenor-Respondents' Cross-Motion for Summary Judgment

[Doc. No. 174] are **granted.**  Respondents' Motion to Strike [Doc. No. 182] is **granted in part**

and **denied in part.**  Judgment shall enter for Respondents, and the Clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, this  _22nd_  day of August, 2008.

---

[12]       The Order was originally due to expire on August 14, 2005, but was twice amended to extend the expiration date.  (See Fed. Resp'ts' Ex. 6, Order 3259; Order 3259 Am. No. 1 (Aug. 11, 2005); Order 3259 Am. No. 2 (March 31, 2006).)

[13]       STN also argues that the Department failed to provide the notice required by the VRA, 5 U.S.C. § 3349, thereby invalidating Cason's authority to issue the RFD.  This argument is premised solely on evidence that has been stricken from the record as inadmissible hearsay.  Accordingly, the Court will not consider the argument any further.

_____/s/_____
Peter C. Dorsey, U.S. District Judge
United States District Court